462 So.2d 1021 (1984)
David Lee WALDROP
v.
STATE.
1 Div. 784.
Court of Criminal Appeals of Alabama.
October 23, 1984.
Rehearing Denied December 11, 1984.
Certiorari Denied January 25, 1985.
*1023 John Bertolotti, Jr., Mobile, for appellant.
Charles A. Graddick, Atty. Gen. and William D. Little, Asst. Atty. Gen., for appellee.
Alabama Supreme Court 84-308.
PATTERSON, Judge.
Appellant David Lee Waldrop was indicted in a two-count indictment by the Mobile County Grand Jury in May 1980, one count charging murder in the first degree of two persons by one act or a series of acts, and one charging a killing incident to a robbery or attempt to rob. Ala.Code 1975, § 13-11-2(a)(2) and (10) (1975) (repealed 1980). Appellant was found "guilty of the capital felony as set out in the indictment", and that conviction was subsequently reversed by this court in Waldrop v. State, 424 So.2d 1345, 1346 (Ala.Crim.App.1982), cert. denied, No. 82-226 and 82-227 (Ala.1983). Appellant was retried pursuant to the original indictment on January 9, 1984; he was found "guilty of the capital felony as charged in the indictment", and sentenced to life imprisonment without parole. It is from this second conviction that Waldrop now appeals.
On the afternoon of July 11, 1977, Richard Hacker, assistant manager of Delchamps Store No. 10, and Terry Stainback, a part-time cashier, left the store with the afternoon bank deposit. Thirteen days later *1024 their partially decomposed bodies were discovered in a remote, wooded area in west Mobile County. Each victim had been killed by a single shotgun wound to the head.
Police authorities in Mobile had no leads on this double homicide for over two years. On December 12, 1979, Detective Willie Estes received a call from Lance Delaney of the Hillsborough County Sheriff's Department in Tampa, Florida. Delaney informed Estes that he had some information, from an informant, regarding a double homicide in which two people were taken some distance from a store, robbed, and killed with a shotgun. Delaney further inquired from Estes as to whether there was a reward connected with the case, to which Estes replied in the affirmative. Estes requested additional information on the matter and asked Delaney to call back if such was obtained. Delaney called back a few days later with a more detailed account of the informant's knowledge. According to Delaney the "confidential informant" said that two people were involved in the Delchamps killings. One person was named Larry Stahl,[1] and the other person's name was not known by Delaney. Delaney, however, did state that the second person lived on Roderick Street in Mobile next door to a Mr. Millwood and that this second person's mother was employed by Delchamps. The informant also told Delaney that the two individuals involved in the crime used the vehicle and gun belonging to the second person's father. Upon investigation of this information, the police focused their investigation upon appellant. It was ascertained that appellant lived at the address stated and that appellant's mother was employed at the same Delchamps store as that at which the homicide victims had been employed.
On January 2, 1980, Detective Estes and three other officers flew to Tampa to meet with the informant, Roy Reynolds. Reynolds, in turn, took the officers to one Charles Roberts, who had given Reynolds the information he knew about the Delchamps killings. Roberts verified the information Reynolds had told the authorities.
Roberts told the investigators that he and Luke Stahl had been in the military together and were roommates in Mobile around the time of the Delchamps killings. Luke Stahl is the brother of Larry Stahl, whom Reynolds had implicated in the killings. Roberts stated that one night between the time of the robbery and the time the bodies were discovered he and Luke were in a bar in Mobile; that Luke told Roberts that Larry Stahl and appellant had abducted the two people from Delchamps and had killed them. According to Roberts, Luke said that appellant did the actual killing; that the vehicle and gun used belonged to appellant's father; and that appellant's mother and father were on vacation at the time of the incident. The investigators learned from Roberts that Luke and Larry lived in Larkin, Kansas.
On January 4, 1980, Estes and the other three officers flew to Larkin, Kansas, where they talked to Larry Stahl. Larry Stahl denied any participation in the crime. The investigators also spoke with Luke Stahl, who claimed appellant's gun had been used and that his brother, Larry, was not the killer. Luke refused to tell the investigators how he knew these facts. After talking with both Luke and Larry, Estes called Detective Driggers in Mobile and told Driggers to "pick up" appellant.
Detective Driggers and two other officers proceeded, without a warrant, to appellant's residence at approximately 9:30 p.m. on January 4, 1980. Upon their arrival appellant answered the door and the officers identified themselves as law enforcement officers. Appellant was requested to accompany the officers downtown, because they needed to talk with him. Appellant asked to get his coat and stepped back in the house; the officers, one *1025 on each side of appellant, followed him into the house. While inside, appellant attempted to use the telephone; however, Driggers put his finger on the cut-off button of the telephone, preventing appellant from using the phone, and told appellant he could make any calls he wanted from the Sheriff's Office downtown. Appellant was then escorted outside his home, with officers on each side. Appellant asked if the officers thought he needed a lawyer, and was told he could call one if he thought he would need one.
Appellant was taken to the Sheriff's Office. After his arrival he apparently asked if he had to stay there. Officer Baker testified at the preliminary hearing that appellant was told "in a sense" that if he tried to leave "we'll probably arrest you." At trial Officer Baker did not remember saying this; however, his testimony produced from the preliminary hearing was used to refresh the officer's vague memory. At no time was appellant told he was under arrest nor was he told that he was free to go or that he did not have to accompany the officers.
Appellant was then given a form listing his Miranda rights, which he appeared to read and understand; appellant then signed a waiver of these rights. Initially appellant denied any participation in the Delchamps killings. After about twenty minutes appellant asked, "Well, what's going to happen to me? What's going to happen to me if I tell you about it?", to which Officer Driggers advised, "It's just according to whether you pulled the trigger or not". At that point appellant gave an oral statement. The detectives then contacted District Attorney Galanos, who, upon arrival, re-read appellant his Miranda rights, had appellant sign a second waiver form, and proceeded to take a written statement from appellant.
In this statement, which was read to the jury, appellant related in detail the circumstances of the murder and robbery, stating that he and Larry Stahl had abducted Hacker and Stainback from the parking lot of Delchamps No. 10 and taken them to a secluded area where appellant tied the victims' arms together. Stahl burned the bank bag and its contents except the cash. Appellant stated that as he was entering the vehicle Stahl shot Hacker and then Stainback with a shotgun that appellant had illegally purchased some months before. Appellant stated that these events occurred while his parents were on vacation and that they had used his father's car. Appellant further stated that his mother worked for Delchamps No. 10, and that he also worked there for a while. He was familiar with the store's deposit procedure and had heard his mother tell his father about it before. Finally, appellant disclosed that the shotgun had been disposed of at a land fill and that shortly thereafter appellant left for North Carolina.

I
Appellant first contends that the trial court erred in refusing to allow individual voir dire of the jury necessitated by adverse pretrial publicity. Appellant maintains that, because many of the prospective jurors indicated they had heard or seen something about the case, appellant should have been allowed to individually determine which jurors were aware of his previous reversed conviction. Appellant offered no evidence of the extent of any prejudicial pretrial publicity, nor has he asserted any in brief, other than the fact that many jurors had heard or seen something about the case.
As a general rule, it is within the trial court's discretion to allow individual voir dire of prospective jurors. See Duncan v. State, 436 So.2d 883, 900 (Ala.Crim. App.), cert. denied, (Ala.1983), cert. denied, ___ U.S. ___, 104 S.Ct. 720, 79 L.Ed.2d 182 (1983), and cases cited therein. Additionally, this court has recently stated:
"Prospective jurors who have heard of a previous conviction on the same charges need not be automatically excluded from the venire.... A prospective juror with knowledge of a previous conviction need not be dismissed for cause, if the *1026 trial court determines that the juror does not have a fixed opinion of appellant's guilt, but rather can lay aside any preconceived notions or opinions and render a verdict based solely upon the evidence presented in court."
Beck v. State [Ms. 7 Div. 909, March 20, 1984] (Ala.Crim.App.1984) (citations omitted) (emphasis in original). The mere fact that prospective jurors know something about a case, at the time of empaneling, is not unusual, nor is it sufficient to invoke individual voir dire where the trial court takes the necessary steps to ensure that the accused receives a fair trial by a panel of impartial and indifferent jurors. We expect that citizens of this state will take an interest in the affairs of their community, and where a criminal act occurs in a certain community, the accused cannot expect that the venire, drawn from that community, will be totally devoid of any knowledge surrounding the circumstances of the criminal act. "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961).
Appellant relies on United States v. Hawkins, 658 F.2d 279 (5th Cir.1981); United States v. Liddy, 509 F.2d 428 (D.C. Cir.1974); and Silverthome v. United States, 400 F.2d 627 (9th Cir.1968), to support his contention of error. These cases have been interpreted to hold that no basis for reversal is present unless the accused has shown that the trial court abused its discretion to the substantial prejudice of the accused. Liddy, 509 F.2d at 453. Whether substantial prejudice exists depends upon the totality of the circumstances. Id. The Fifth Circuit further elaborated on the trial court's discretion, stating:
"This broad discretion, however, is limited by the requirements of due process, and the reviewing court must independently evaluate the voir dire testimony of empanelled jurors, as well as the record as a whole, and determine whether the method of voir dire adopted by the district court is capable of giving `reasonable assurances that prejudice would be discarded if present' ... The district court's decision will `not be lightly overturned'."
Hawkins, 658 F.2d at 283 (citations omitted). We agree with the line of reasoning espoused by the federal courts; however, appellant fails to prove that the trial court abused its discretion, because he fails to show substantial prejudice due to pretrial publicity.
In the three federal cases relied upon by appellant, there was a clear showing of the nature and extent of the pretrial publicity. In Hawkins, supra, the "appellants filed... over forty articles appearing in the local Beaumont, Texas newspapers, as well as transcripts of several television reports, all relating to the arrests, indictments, and pretrial activities surrounding the case". 658 F.2d at 284. The court went on to discuss the enormous amount of adverse pretrial publicity that occurred in this case and stated:
"Of course this does not mean that every case involving exposure to pretrial publicity automatically requires the `time consuming, probing, preferably individual voir dire described in [United States v.] Davis [583 F.2d 190 (5th Cir.1978)]...; nor does it mean that such an examination, when necessary, must always be conducted apart from the other jurors.... What it does mean, however, is that when the nature of the publicity as a whole raises a significant possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning ... is necessary...."
Hawkins, 658 F.2d at 285 (citations omitted). Likewise, overwhelming evidence of adverse pretrial publicity surrounding the trials was present in Liddy, supra, and Silverthorne, supra. As noted previously, no such evidence was admitted or is argued in the case sub judice.
Absent a showing that the nature of the pretrial publicity as a whole raises a significant possibility of prejudice, the *1027 court is acting wholly within its discretion in denying a motion for individual voir dire. This should not be construed as a direction to implement individual voir dire on a showing of substantial pretrial publicity; individual voir dire remains within the sound discretion of the trial court. In conclusion, we note that the trial court's approach to qualifying the jury was very similar to the approach used in Liddy, 509 F.2d at 436, wherein the court stated:
"[The] trial judge used voir dire examination procedures similar to those employed in [United States v.] Bryant [471 F.2d 1040 (D.C.Cir.1972)]general questions addressed to the entire array, followed by individual questioning of those who responded affirmatively to any of the initial inquiries, and thus raised the possibility they might have formed an opinion on the case. Although the trial judge recognized that the Watergate matter had been publicized extensively, he did not abuse his discretion in declining the defendants' request that all the veniremen who had heard anything about the case be examined individually."
In the case at bar the trial judge interviewed the veniremen in panels of twelve, clearly instructed the members of each panel not to state what they had heard, and determined whether what they had heard would affect their verdict. No communication of any prejudicial information occurred. Those jurors who indicated that what they heard would affect their verdict were dismissed from the panel. The judge allowed the attorneys to submit additional questions if they wished. We have reviewed the record in this matter and conclude that the trial court's method of empanelling the jury provides reasonable assurances that prejudices would have been discovered if present. We find absolutely no abuse of discretion in the trial court's method of empanelling the jury.

II
Appellant contends that he was illegally arrested in his home, without a warrant, or without probable cause coupled with exigent circumstances. Appellant relies on Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), which holds that the Fourth Amendment prohibits the police from making a warrantless and non-consensual entry into a suspect's home for the purpose of making a routine felony arrest.
This issue was addressed on appellant's first appeal to this court, wherein we stated:
"Other than the mere fact of the officers' physical presence, there is nothing in their conduct to suggest any element of coercion. As in State v. Anonymous, 37 Conn.Sup. 755, 436 A.2d 789 (1981), the defendant willingly came out of his house onto his front porch. At that time Payton did not apply and its rule protecting against a warrantless entry into a home was no longer applicable. `Although the porch of a house may be characterized as private under the law of property, it is not usually a place where a person has a reasonable expectation of privacy and the same Fourth Amendment protection (as his home) is not afforded.' Anonymous, 436 A.2d at 793. See also United States v. Santana, 427 U.S. 38, 42, 96 S.Ct. 2406, 49 L.Ed.2d 300 (1976)."
Waldrop v. State, 424 So.2d 1345, 1350 (Ala.Crim.App.1983).
In addition to the above cited authority, we find additional support for the proposition that an arrest outside the boundaries of a home does not fall within the protection of Payton, supra, from the Payton case itself, wherein it is stated:
"The Fourth Amendment protects the individual's privacy in a variety of settings. In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's homea zone that finds its roots in clear and specific constitutional terms .... In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house." *1028 Payton, 445 U.S. at 589-590, 100 S.Ct. at 1381-1382 (emphasis added). The protections afforded in Payton clearly do not apply outside the physical boundaries of the home. The theoretical basis of the Payton decision is that an arrest within a home violates the "sanctity of the home", id. at 589, 100 S.Ct. at 1381, whereas outside the boundaries of the home, no such violation is present, id. at 587, 100 S.Ct. at 1380.
The actual point of an arrest is usually a question of fact. Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968); Foy v. State, 387 So.2d 321 (Ala.Crim.App.1980). An arrest occurs when one's freedom of movement has been curtailed. Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959); Foy, supra, at 324. In 6A C.J.S. Arrest § 2 (1975), "arrest" is defined:
"An arrest is the taking, seizing, or detaining the person of another by touching, or by any act which indicates an intention to take him into custody and subject the person arrested to the actual control and will of the person making the arrest, or any deprivation of the liberty of one person by another or any detention of him, for however short a time, without his consent, and against his will, whether it was by actual violence, threats, or otherwise. [emphasis added]."
From the record before us it is clear that appellant was taken into custody and subjected to the actual control and will of arresting officers while on the front porch of his home. This is evidenced from the facts that (1) the officers escorted appellant into his home in order to allow appellant to obtain his coat; (2) the officers prevented appellant from making any communications with the outside world when Detective Driggers disconnected appellant's attempt to telephone his father; (3) the officers escorted appellant outside his home to the awaiting police car; and (4) when appellant asked if he could leave, Officer Baker indicated that he would be arrested if he tried to do so.
We, therefore, conclude that appellant was actually arrested while on the front porch of his home and hold that when a person voluntarily removes himself from the boundaries of his home the protections afforded in Payton, supra, no longer apply. In making this determination we do not express any opinion as to the situation where a person is coerced or involuntarily removes himself from the boundaries of his home.

III
Having determined that appellant was arrested outside his home, we next determine the question of whether the police had sufficient probable cause to validly arrest appellant without a warrant. In order for a warrantless arrest to be valid, the arresting officer must have probable cause to make the arrest. Foy v. State, supra; Braxton v. State, 350 So.2d 753 (Ala.Crim. App.1977); Sexton v. State, 349 So.2d 126 (Ala.Crim.App.1977); see also, Ala.Code (1975), § 15-10-3(3). In making this determination of probable cause, we are guided by the United States Supreme Court's most recent directions. In Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), the Aguilar-Spinelli tests were abandoned in favor of the "totality of the circumstances test". 103 S.Ct. at 2332; McCants v. State, 459 So.2d 992 (Ala.Crim. App.1984). The Court in Gates, supra, clarified its prior holdings in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969), by stating:
"[A]n informant's `veracity', `reliability' and `basis of knowledge' are all highly relevant in determining the value of his report. We do not agree, however, that these elements should be understood as entirely separate and independent requirements to be rigidly exacted in every case .... Rather, as detailed below, they should be understood simply as closel intertwined issues that may usefully *1029 illuminate the commonsense, practical question whether there is `probable cause' to believe that contraband or evidence is located in a particular place."
103 S.Ct. at 2327, 2328.
The existence of probable cause must be determined from the facts of each case. Carter v. State, 435 So.2d 137, 139 (Ala.Crim.App.1982); Moore v. State, 415 So.2d 1210 (Ala.Crim.App.1982), cert. denied, 459 U.S. 1041, 103 S.Ct. 459, 74 L.Ed.2d 610 (1982); Hatton v. State, 359 So.2d 822 (Ala.Crim.App.1977), cert. quashed, 359 So.2d 832 (Ala.1978). One does not have probable cause unless he is possessed of information upon which, if submitted to a magistrate, a warrant would be issued. Ex parte Meeks, 434 So.2d 844 (Ala.), on remand Meeks v. State, 434 So.2d 848 (Ala.Crim.App.1983); Knight v. State, 346 So.2d 478, 481 (Ala.Crim.App.), cert. denied, Ex parte State ex rel. Attorney General, 346 So.2d 483 (Ala.1977), appeal after remand, Knight v. State, 356 So.2d 765 (Ala.Crim.App.1978). It has been stated that probable cause exists "where the facts and circumstances within the officer's knowledge and of which he has reasonable trustworthy information are sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed". Knight, supra, at 481, and cases cited therein. "Probable cause is concerned with `probabilities', that `are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act'", Carter v. State, 435 So.2d at 139 (quoting Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949)); see also Illinois v. Gates, 103 S.Ct. at 2328, quoting Brinegar, supra, with approval.
The facts of this case contain sufficiently reliable information to warrant a finding of probable cause, thus making the appellant's arrest valid. The information supplied to Detective Estes by Ray Reynolds was verified by independent police corroboration. Ray Reynolds's factual rendition was then verified by Charles Roberts, who appears to be merely a citizen informer who received no pecuniary gain for his part in the investigation. Roberts established his basis of knowledge on information he had received from Luke Stahl, Larry Stahl's brother. Roberts, furthermore, informed the detectives as to the present location of Luke and Larry, which was also verified.
Luke Stahl provided the final information which clearly establishes the existence of probable cause. Larry denied everything; Luke stated that Larry did not kill anyone, yet the implication is present, that Larry had participated in the robbery-murder, along with appellant.
The reliability of the informant's information, when viewed from the totality-of-the-circumstances position, clearly establishes the necessary probable cause to effectuate a warrantless arrest. Luke Stahl basically corroborated and verified the information supplied by Reynolds and Roberts. Luke Stahl essentially informed on his brother in his attempt to protect him. The information supplied by the informants came from Luke Stahl, whose relationship to Larry Stahl makes it unlikely that Luke Stahl would fabricate this story in order to implicate appellant and his brother (Larry) in a robbery-murder crime. Upon verification of the facts supplied by Reynolds and Roberts, through the implied admission of Luke Stahl, the police clearly had probable cause to obtain a warrant for appellant's arrest.

IV
Appellant's final contention is that the trial court improperly instructed the jury on finding "`a particularized intent to kill' by the non-triggerman accomplice". Ex parte Raines, 429 So.2d 1111, 1112 (Ala.1982). The Alabama Supreme Court set forth the requirements of this question in Ex parte Raines, 429 So.2d at 1113:
"To affirm a finding of a `particularized intent to kill,' the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude *1030 that the defendant possessed the intent to kill."
The trial court properly instructed the jury on the intent to kill issue, the record, in pertinent part, is as follows:
"COURT: In addition to this robbery or while in the commission or perpertration of this crime, the Defendant must have intentionally killed the deceased, Richard Hacker, as opposed to accidentally or unintentionally. In this case under this count, again, you would have to believe beyond a reasonable doubt and to a moral certainty, first, that David Lee Waldrop did rob or attempt to rob the deceased, Richard Hacker, as I have defined that for you, and that he intentionally killed him.
* * * * * *
"You must look to all the surrounding facts and circumstances of this case to determine if that specific intent to kill is present."
The court then correctly instructed the jury on accomplice liability. Appellant argues that no distinction was made between an accomplice to the robbery and an accomplice to the killings. The court, however, did instruct the jury that appellant could not be convicted of capital murder under the felony-murder doctrine. The court specifically instructed the jury that "intent cannot be supplied by the felony-murder doctrine". The jury was thus properly instructed on the issue of "particularized intent to kill" stemming from appellant's participation as an accomplice to the killings, rather than his participation as an accomplice to the robbery.
The jury could rationally conclude from the evidence presented at trial that appellant possessed the intent to kill, based on accomplice liability theories. There can be no doubt that appellant encouraged and supported his cohort and was present to render assistance should it become necessary. In appellant's statement, which was admitted into evidence, and before the jury, appellant stated that he supplied the murder weapon and bound the hands of the victims. The jury could rationally conclude from this evidence that appellant possessed the particularized intent to kill necessary to support a conviction of capital murder.
We have carefully searched the record for errors injuriously affecting the substantial rights of appellant and have found none. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.

On Rehearing
PATTERSON, Judge.
On application for rehearing, appellant asserts that the record does not support the conclusion that appellant ventured beyond the threshold of his home such that the protections afforded in Payton v. New York, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), were inapplicable. Appellant also requests additional statement of facts pursuant to A.R.A.P. 39(k). Appellant asserts that the testimony of Officer Baker establishes that appellant was inside the boundaries of his home. Officer Baker was asked on direct examination:
"Q. All right. So, apparently Mr. Waldrop had come outside the house to speak to you initially?
"A. This was at the door itself. We was standing on the edge of the porch and he was standing inside the house at the door."
This testimony of Officer Baker standing alone does not clearly establish that appellant was inside or outside his home; the testimony is vague and subject to interpretation, especially in view of the question being phrased with the term "initially". This line of questioning of Officer Baker was not pursued to establish specifically by him where the appellant was located when the officers first talked with him, nor was the subject broached on cross-examination.
On appellant's motion to suppress the statement made by appellant, the defense offered the testimony of Mr. Aubrey Dean Robinson, who was visiting at appellant's *1031 home the night he was arrested. In testifying before the court, Mr. Robinson related the following:
"Q. After the knock on the door what happened?
"A. David, he answered the door and then he walked out and I noticed there was about two or three men. He walked out.
"Q. Did you see who was at the front door?
"A. Just two or three men, that's all.
"Q. Two or three men, and you say David walked outside?

"A. Yes, sir.

"Q. Did you hear anything that was said either when the two men knocked on the door and he answer "or outside"?

"A. No, sir.
"Q. All right, approximately how long were they outside?
"A. About fifteen, twenty minutes.
"Q. And did all of you all remain in the house while these people were outside?

"A. Yes, sir.
"Q. And then after remaining out there fifteen or twenty minutes what happened?
"A. Then two men escorted him inside and ...
"Q. In what manner did these two men come into the house?
"A. Sir?
"Q. How did these two men come into the house?
"A. One on each side of David?

(emphasis added). This testimony was elicited by appellant's attorney on direct examination at the hearing to suppress appellant's confession, based on appellant's alleged grounds of illegal arrest and invasion of his home. The appellant did not take the stand to testify for the limited purpose of adducing evidence of his arrest. The clearest testimony as to appellant's movements when the officers arrived, came from Mr. Robinson, who testified on behalf of appellant and was inside the home when these events occurred. The trial court had ample evidence upon which to base a finding that appellant was legally arrested. The appellant's contention that he was illegally arrested in his home without a warrant is therefore without merit.
We have reviewed appellant's two remaining contentions in his application for rehearing, and find them also to be without merit.
Consequently, for the reasons herein stated, appellant's application for rehearing is due to be, and the same is hereby, overruled. His motion filed pursuant to A.R. A.P. 39(k) moving the court to adopt certain facts is due to be, and is hereby, denied.
APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED; OPINION EXTENDED.
All Judges concur.
NOTES
[1] See Stahl v. State, 426 So.2d 909 (Ala.Crim. App.1982), writ quashed, 426 So.2d 917 (Ala. 1983).