Raymond Eugene Brown was indicted in a four-count indictment for the murder of two persons pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10), Code of Alabama 1975; murder while the defendant is under a sentence of life imprisonment, in violation of § 13A-5-40(a)(6), Code of Alabama 1975 (two counts); murder during the course of sexual abuse in the first or second degree, in violation of § 13A-5-40(a)(8), Code of Alabama 1975. The jury found the appellant guilty of all four capital offenses charged in the indictment. Following the sentencing phase of the trial, the jury unanimously recommended the death penalty. The trial judge accepted the jury's recommendation and sentenced the appellant to death.
On the afternoon of August 9, 1987, David LeMonte returned his six-year-old son, Aaron, to the home of David LeMonte's ex-wife and Aaron's mother, Linda LeMonte. Linda LeMonte's home was located on Baffin Court in Montgomery, Alabama. Linda LeMonte; her ten-year-old daughter, Shelia Smoke; and the appellant were there when David LeMonte dropped off Aaron.
On the morning of August 10, 1987, Linda LeMonte's boss called Beverly Evans, Linda LeMonte's mother, and reported to her that Linda had not come to work. When Evans learned that her grandchildren were not at school, Evans and her husband went to Linda's house. When no one answered the door, Evans went to Aaron's bedroom and knocked on the window. Aaron came out from under the covers of his bed and went and opened the front door. Evans then discovered the body of her daughter in the living room and the body of her granddaughter in a bedroom.
Dr. Allan Stillwell performed the autopsies on the victims' bodies. Stillwell testified that Linda LeMonte died as a result of a nine-inch cut to her throat. LeMonte also sustained multiple stab wounds to other parts of her body including numerous stab wounds to the areas of the vagina, rectum and breasts. LeMonte's abdominal cavity was completely opened up by a twenty-seven inch cut which began in the lower portion of the neck and ended at the right side of the pubis in the lower abdomen.
At the time Shelia Smoke's body was discovered, a knife was protruding from her umbilicus. Very little of the knife blade was exposed. The autopsy performed on Smoke's body revealed that the cause of death was multiple stab wounds to the chest, throat, and abdomen. Stillwell testified that there was evidence that Smoke had been sexually assaulted prior to her death.
A piece of paper with the names "Raymond," "Shelia," and "me" written on it was found beside LeMonte's body near some playing cards. A photograph of LeMonte's dead body was found on the television set. The appellant's fingerprint was found on this photograph and on a film *Page 347 
roll in a camera which was lying on the sofa. Several knives were found in LeMonte's house, including one found in Smoke's bedroom which was identified as belonging to the appellant. Blood consistent with LeMonte's blood was found in the appellant's apartment and car.
Around 6:15 on the morning of August 10, 1987, prior to the discovery of the bodies of LeMonte and Smoke, State Trooper Mary B. Sterling went to the scene of an accident in Elmore County, Alabama, where a car had run off the road into a ditch. When she arrived at the scene, the driver of the car that ran off the road gave her his driver's license. The name on the driver's license was that of the appellant. When Sterling asked the appellant if he was hurt, the appellant told her that he was not. The appellant said that he had had too much to drink the night before and that he had run the car into the ditch. The appellant removed a grocery sack and a fishing rod from the trunk of his car and headed toward the river. Sterling then had the appellant's car towed since she did not know how much the appellant had had to drink.
On August 12, 1987, Michael Williams, with the Montgomery County Sheriff's Department, was searching for the appellant in the Wallsboro area off Highway 231 in Elmore County. Williams stopped at an Amoco station, where he received a call that someone who fit the appellant's description had just come out of the nearby woods and was walking down the road. Williams approached this person and asked for identification. This person gave him a driver's license with the name Raymond Eugene Brown. The appellant was then taken into custody.
 I
The appellant argues that the trial judge erred by refusing to allow individual voir dire of the jury venire concerning pretrial publicity. Prior to the voir dire of the jury, the following occurred:
 "[THE COURT:] I will voir dire the jury. I will — when I feel I have adequately asked all of the questions, either side can move the court to allow you to ask a few questions yourself, and I will consider that. Okay. If you feel there is something I haven't covered, I will consider that. Didn't you file a motion for individual voir dire?
"MR. HOLLIFIELD: We have.
"MR. BLANCHARD: Yes, sir.
 "THE COURT: Then we'll go one-on-one and just put the jury in the jury box and take them in the jury room and I will ask them the essential questions that we have to ask, and that's the way we'll do it.
 "MR. BLANCHARD: May we have a right to follow up on questions?
"MR. BLANCHARD: May we be heard on that?
"THE COURT: Sure.
 "MR. EVANS: Your Honor, we feel that the court — we urge the court to reconsider calling out each individual voir dire.
 "THE COURT: I think in this case, it's necessary. I am going to voir dire the venire in mass. Then, of course, it may be necessary for me to call in individuals and ask them specific questions." (RR. 188-90.)
During the voir dire of the jury as a whole, the trial judge asked the following question:
 "Now, ladies and gentlemen does anyone know anything about this case, either what you have heard, read, know firsthand, news media, anybody know anything about this case, okay, please stand." (R. 94.)
Of the 66 members of the jury venire,[1] 42 members (or 63%) responded affirmatively. The trial judge then continued:
 "[THE COURT:] All right. Now, ladies and gentlemen, those of you who stood and stated that you had either read, heard, or talked about this particular case, this is one of the most crucial questions I have asked all morning. This is the question where the seriousness of *Page 348 
your oath will come forth. You will understand the seriousness of it again, the only thing this court, — the thing this court is required to do, and these lawyers are required to do, is to strike or empanel a fair and impartial jury. That's what the system requires. That's what we intend to do. Is there any member of the venire who has heard, read, talked about, know anything about this case, or believes that you have already formed some opinion, have any preconceived ideas, have a predisposition to the extent that it would interfere with your ability to go into the jury room with the rest of the jurors, if you are selected to serve on this jury, and that you could not sit with the rest of the jurors, absorb the evidence, listen to the evidence, weigh it, sift through it, and at the appropriate time, render a fair and impartial verdict, based on the evidence, and the law that I charge you is applicable in this case? I'm going to give you until 1:30 to make that decision, because we are going to take a lunch break. I want to let you think about that question because that's the crucial question in this case, where those that have read or heard something about this case, could you still be a fair and impartial juror. Court will be in recess until 1:30.
"(Noon recess.)
 "BY THE COURT: All right, the question I asked you just before lunch, any member of the venire believes or those that stood said that you had heard, read, talked about this matter, either one of you feel that it would interfere with your ability to render a fair and impartial verdict with the rest of the jurors, after listening to the evidence and the law that I charge you that is applicable in this case, if you would, please stand? Any further questions." (R. 97-99.)
At this point, defense counsel requested a hearing outside the presence of the jury. Defense counsel stated that due to the unusual amount of pretrial publicity, he wished to individually question the jury venire about what they had heard or read about the case and how any publicity about the case had affected them. Defense counsel told the judge that individual voir dire was particularly important since the trial judge had stated in his order denying the motion for change of venue that a thorough and extensive voir dire was the best method of demonstrating jury prejudice. Defense counsel stated that he did not believe that the jury had been thoroughly examined on the issue of pretrial publicity and that he felt that the jurors might be reluctant to admit that they could not be fair and impartial in front of the entire venire. In response, the court stated that he believed that individual voir dire was necessary only if a prospective juror equivocated as to whether he or she could be fair and impartial. The court then asked the jury venire the following questions:
 "BY THE COURT: Does any juror member of the venire know of any reason, any reason whatsoever that you believe that you should not be selected to serve on this jury? If you do, stand, I'll take you in chambers and find out what the reason is. . . . Any juror again, any juror know of any reason, and particularly those who stood this morning and said that you had read, heard talked about on the news media or otherwise, something concerning this case? Based on that, anyone know of any reason based on what you have heard that you should not or believe that you should not sit on this jury? Anyone has any predisposed position about this case, what you have heard, read, or said or talked about? Anyone in your mind feel that you could not be fair in this matter, or render a fair, impartial verdict based on the evidence and the law, based on what you have heard, read, seen or talked about? Anyone else, believe that — just come forth, anyone else?" (R. 111-12.)
At this time two of the jurors were taken into chambers. Each juror admitted separately that they could not be fair and impartial because of the things they had heard about this case in the news media. The trial judge excused these two jurors and defense counsel renewed the request for individual voir dire. Defense counsel stated that the fact that these two jurors *Page 349 
did not come forward when the trial judge initially asked the question concerning their ability to be impartial was evidence of the need for individual voir dire. The trial judge then denied defense counsel's request to examine the jurors separately regarding pretrial publicity, and the jury was struck.
The appellant contends that the trial court's denial of his request to individually voir dire the jury venire was error. As a general rule, the decision whether to voir dire prospective jurors individually or collectively is within the sound discretion of the trial court. Waldrop v. State, 462 So.2d 1021
(Ala.Crim.App. 1984), cert. denied (Ala.), cert. denied,472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 618 (1985). This is true even in a death case; Edwards v. State, 452 So.2d 487
(Ala.Crim.App. 1982), rev'd on other grounds, 452 So.2d 503
(Ala. 1983); Bell v. State, 475 So.2d 601 (Ala.Crim.App. 1984),aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038,106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Whisenhant v. State,555 So.2d 219 (Ala.Crim.App. 1988), cert. denied, 555 So.2d 235
(Ala. 1989), (court allowed defense counsel to individually voir dire venire concerning knowledge of the facts of the defendant's case and the prior sentences he had received and concerning pretrial publicity). However, the trial court's discretion in this matter is "limited by the requirements of due process." United States v. Hawkins, 658 F.2d 279, 283 (5th Cir. 1981). "Individual questioning may be necessary in some circumstances to gain assurance that all prejudice has been exposed." United States v. Hurley, 746 F.2d 725, 727 (11th Cir. 1984).
In Jordan v. Lippman, 763 F.2d 1265 (11th Cir. 1985), the Eleventh Circuit Court of Appeals held that the defendant was deprived of due process and his right to an impartial jury because the trial judge failed to individually voir dire the jurors as to whether they had been exposed to some prejudicial publicity which had occurred during the trial. The holding inJordan stems from the Fifth Circuit Court of Appeals' decision in United States v. Davis, 583 F.2d 190 (5th Cir. 1978). InDavis, the case was the subject of extensive pretrial publicity. Prior to trial, defense counsel filed a motion requesting the opportunity to individually examine each juror who had been exposed to the publicity to determine the extent to which the juror had been exposed to the publicity and how it had affected that juror. Defense counsel also introduced the pretrial publicity into the record. After determining during voir dire that all of the prospective jurors had heard about the case, the trial judge asked the jurors if their exposure to the pretrial publicity affected their ability to be impartial. None of the jurors responded. The trial judge then denied defense counsel's request to individually voir dire the jurors concerning the effect of the pretrial publicity on them.
The Davis court, citing the ABA Standards Relating to Fair Trial and Free Press, held that merely asking the jury panel as a group whether the pretrial publicity affected their ability to be impartial was inadequate under the circumstances of the case and stated that the trial court "should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial" so that the trial court could determine "for itself whether any juror's impartiality had been destroyed." Davis, 583 F.2d at 196-97.
 "A fundamental principle of due process requires that the jury's verdict be based on evidence received in open court, not from outside sources. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Irvin v. Dowd, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d at 751 (1961). A juror's impartiality is not necessarily destroyed when he is exposed to pretrial publicity. 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court' Irvin v. Dowd, 366 U.S. at 723, 81 S.Ct. at 1643, 6 L.Ed.2d at 756; see Calley v. Callaway, 519 F.2d 184, 205-06 (CA5, 1975) (en banc), cert. denied, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). But when a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine *Page 350 
whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination."
Davis, 583 F.2d at 197.
In a later case, United States v. Gerald, 624 F.2d 1291 (5th Cir. 1980), cert. denied, 450 U.S. 920, 101 S.Ct. 1369,67 L.Ed.2d 348 (1981), the Fifth Circuit Court of Appeals, while reaffirming the principles set out in its opinion in Davis, found that the district court did not err by failing to conduct the type of inquiry described in Davis because there was no evidence in the record of the nature or extent of the pretrial publicity in that case.
 "The time consuming, probing, preferably individual voir dire described in Davis generally is not required in cases involving unsupported general allegations of prejudicial pretrial publicity or in cases where the publicity does not create a significant potential of prejudice."
Gerald, 624 F.2d at 1298. See also United States v. Holman,680 F.2d 1340 (11th Cir. 1982) (no significant possibility of prejudice where publicity was of "innocuous factual nature" and "much of it consisted of information which would have been admissible at trial"); Waldrop (individual voir dire not required because "appellant offered no evidence of the extent of any prejudicial pretrial publicity"); Hurley (possibility of prejudice not great enough to require individual questioning of jurors).
The Eleventh Circuit Court of Appeals in Jordan stated that "[t]he continued vitality of the principle elucidated in theDavis case — significant possibility of prejudice plus inadequate voir dire — has been evidenced by binding precedent in this circuit." Jordan, 763 F.2d at 1275 (citations omitted). This court adopted the reasoning of the federal courts inWaldrop v. State, 462 So.2d 1021 (Ala.Crim.App. 1984), cert.denied (Ala. 1985).
Thus, we must determine whether the pretrial publicity in this case created a "significant possibility of prejudice." There is little doubt that the case at bar generated extensive pretrial publicity. In support of his motion for a change of venue, the appellant introduced 53 exhibits. These exhibits were newspaper articles and transcripts of radio and television broadcasts. Many of the newspaper articles were front page stories and many of the television and radio broadcasts were the lead stories. Our examination of these exhibits, as illustrated below, leads us to the conclusion that there did exist a "significant possibility of prejudice" due to the pretrial publicity in this case.
Shortly after the murders in this case occurred, a deputy district attorney stated that this case was "one of the most graphically horrible cases we've had since I've been a DA" and "if any case called for the electric chair Brown's does." Montgomery Chief of Police John Wilson referred to the crime scene as "one of the most hideous . . . in this area in a long time."
The appellant remained at large after the murders for several days. During this time, Chief Wilson was quoted as saying that the appellant was "extremely dangerous" and that he was a "psychopathic killer who killed for the pleasure of it."
One article printed during this time stated that LeMonte's neighbors were uneasy and that the children who lived in the neighborhood were scared the appellant was coming to get them. Numerous stories about the massive manhunt for the appellant were published, as were the details of the appellant's capture and arrest. Even the fact that the deputy sheriff who arrested the appellant was honored was reported in the media. Details of the victims' funerals were published, including a picture of LeMonte's young son being hugged by his father.
Several reports stated that the appellant, by waiving his hearing to determine whether he had violated the conditions of his parole, had admitted that he murdered LeMonte and Smoke. The appellant's parole officer stated that he had no doubt that the appellant was confessing to the murders when he signed the waiver. The parole officer also told the press that the appellant told him that he "did it" and that *Page 351 
he gave a statement to the police. It was also reported that a deputy district attorney said that she understood the appellant had confessed to the murders. A psychologist who evaluated the appellant was quoted as saying that there was no evidence that the appellant was psychotic. It was also reported that the psychologist stated that the appellant claimed to have had a memory lapse only as to the day in question.
Almost every article or broadcast mentioned that the appellant had murdered his aunt, his grandmother, and his great-grandmother in Ashland, Alabama when he was 14 years old in 1960. Some of the articles stated that the killings in 1960 were "identical" to the present murders, and the appellant was referred to as the "boy-killer." Someone from Ashland was quoted as saying that he couldn't "remember ever seeing him [the appellant] cry" after his relatives were murdered. One report stated that the appellant had made "threats against many people in Ashland" and that a "fear of another bloodbath lives." Another article alleged that people in Ashland were scared to talk about the appellant due to a "fear of reprisal." A deputy district attorney stated that the appellant should have been given the death penalty in 1960.
Many articles also reported that the appellant had been convicted of assault in the third degree (some articles referred to this conviction as attempted murder) for attempting to choke his landlord. The appellant had been paroled from his imprisonment for the murders of his relatives at the time this assault offense occurred and his parole was revoked because of this assault. The appellant was on parole again at the time he killed LeMonte and Smoke. It was also published that the appellant was known as "Blade Brown" by fellow prison inmates and that they described the appellant as "half-Indian."
By far the vast majority of the publicity in this case concerned the fact that the appellant was on parole at the time he committed these murders. This aspect of the case received statewide attention. The Board of Pardons and Parole was heavily criticized for the Board's decision to parole the appellant in spite of his violent history. The Victims of Crime and Leniency (VOCAL) Organization strongly protested the Board's action in this matter and the group held several news conferences on the subject. Montgomery Chief of Police John Wilson was also critical of the Parole Board's decision to parole the appellant. The attorney who represented the appellant when he was tried for the murders of his relatives in 1960 told the press that the appellant should never have been let out of prison. He said that he had had reason to believe that the appellant would kill again and that he would have told the Parole Board this fact if he had been asked. A deputy district attorney told the press that the district attorney's office was never notified that the appellant was living in Montgomery after he was paroled. As a result of this case, a grand jury investigation was instigated to determine if the Parole Board was too lenient in granting the appellant parole. At least two editorial commentaries were written concerning this matter, including one which stated:
 "By now everyone thinks he understands the mistake made with Raymond Eugene Brown. When an otherwise well-balanced 14-year-old boy carves up his 31-year-old aunt with 123 knife slashes leaving her laid open groin to throat, there's a sexual screw loose somewhere."
Although some of the details reported by the media were properly admitted at the appellant's trial (and thus the jury was not harmed by their pretrial exposure to these facts), most of the information reported was not and would not have been admissible at trial. As we illustrated above, much of the publicity concerning this case was, at the least, potentially prejudicial and at least 63% of the jury venire was exposed to this publicity. The trial judge must have realized that the publicity concerning this case was getting out of hand, since he eventually issued a gag order in this case. However, this was after a great deal of potentially prejudicial information had been published concerning this case. *Page 352 
As we stated earlier, "where there exists a significant possibility of prejudice [due to pretrial publicity] the jurors must in the first instance be questioned as to whether they were exposed. Further inquiry as to the nature of the exposure is then undertaken, if necessary." Jordan, 763 F.2d at 1281
(11th Cir. 1985).
The trial judge's voir dire questions to the jury venire in the case at bar concerning their ability to be impartial were very similar to the examination conducted by the court inDavis, which was found to be inadequate. Here, as in Davis, the court, after determining how many jurors had been exposed to publicity about the case, asked these jurors as a group whether they could be impartial in spite of what they had heard or read about the case. This left the determination as to whether they could be impartial with the jurors themselves. This is a determination which should have been made by the trial judge in this instance.
As this court has stated on numerous occasions, the usual and best method for demonstrating actual jury prejudice is by an extensive and thorough voir dire examination. Arthur v. State,472 So.2d 650 (Ala.Crim.App. 1984), rev'd, 472 So.2d 665
(Ala. 1985) (cited by the trial judge in his order denying the motion for a change of venue). Here the question concerning the jurors' ability to be impartial, asked in different ways, was insufficient to expose potential juror prejudice due to the extensive pretrial publicity. This is evidenced by the fact that it was not until the third time that this question was asked that any jurors responded to this question.
The trial judge should have asked those jurors who had been exposed to the pretrial publicity in this case about the extent of their knowledge of the case. Then the trial judge could have independently determined whether any juror's knowledge about this case had destroyed his or her ability to be fair and impartial. This would have allowed the trial judge to determine for himself whether the juror could lay aside any impression or opinion due to pretrial publicity. We must emphasize that this type of inquiry need be undertaken only where the accused demonstrates potential prejudicial publicity and juror exposure to that publicity. However, "when the nature of the publicity as a whole raises a significant possibility of prejudice, and a juror acknowledges some exposure to that publicity, more than the abbreviated questioning conducted in Davis and in the casesub judice is necessary." Hawkins, 658 F.2d at 285.
 "Where there is a significant possibility of prejudice, the trial court must ensure that voir dire is sufficient to unearth potential prejudice in the jury pool. . . . Consequently, a defendant is deprived of due process and his right to an impartial jury if the voir dire procedure is so limited that it cannot uncover prejudice."
Berryhill v. Zant, 858 F.2d 633, 641 (11th Cir. 1988) (Clark, J., concurring).
As noted in Trujillo v. Sullivan, 815 F.2d 597, 606-07 (10th Cir.), cert. denied, 484 U.S. 929, 108 S.Ct. 296,98 L.Ed.2d 256 (1987),
 "[E]very criminal trial must conform to constitutional standards, [and] our scrutiny in capital trials must be particularly sensitive. Capital trials are unique and ponderous occurrences, distinct from any other exercise of state power. When the machinery of the state seeks to extinguish a life, we must especially ensure that the process employed to accomplish that end complies with the defendant's right to a fair trial by an impartial jury."
Therefore, since the trial judge's voir dire examination of the jury venire was inadequate to allow him to make an independent determination as to whether the jurors' impartiality had been destroyed by the extensive and prejudicial publicity in this case, we must reverse the judgment and remand this case to the trial court. We pretermit consideration of the other issues raised on appeal due to our decision in this matter. The judgment is hereby reversed and the cause is remanded.
REVERSED AND REMANDED.
All the Judges concur.
[1] Originally there were 74 jurors on the venire but the number was reduced to 66 when the trial court released 8 jurors before voir dire began. *Page 353