583 So.2d 276 (1990)
Jerry Paul HENDERSON
v.
STATE.
7 Div. 68.
Court of Criminal Appeals of Alabama.
August 3, 1990.
As Corrected on Denial of Rehearing November 16, 1990.
*280 Jonathan Adams and R.D. Pitts, Talladega, for appellant.
Don Siegelman, Atty. Gen., and P. David Bjurberg and William D. Little, Asst. Attys. Gen., for appellee.
TAYLOR, Presiding Judge.
The appellant, Jerry Paul Henderson, was convicted of the murder of Jerry Wayne Haney, a capital offense as defined by งง 13A-5-40(a)(2) and 13A-5-40(a)(7), Code of Alabama 1975. Following a sentencing hearing, the jury recommended that appellant be sentenced to death. The trial court, after complying with ง 13A-5-47, Code of Alabama 1975, sentenced the appellant to death by electrocution.
The evidence tended to show that late in December 1983, Judy Haney and her children fled their home in Talladega County, Alabama (allegedly to escape the abusive environment that her husband, Jerry Haney, had created). Mrs. Haney and her children went to stay at the home of Jerry and Martha Henderson in Calhoun, Georgia. Martha Henderson and Judy Haney are sisters.
Shortly after Mrs. Haney's arrival in Georgia, she and the appellant began discussing a plan pursuant to which Mrs. Haney would pay the appellant $3,000 in exchange for the murder of her husband. The appellant agreed to the proposed scheme. It was decided that Mr. Haney would be murdered on January 1, 1984.
On New Year's Day, the appellant went to the home of Michael Wayne Wright, an old friend and hunting partner. The appellant asked Mr. Wright if he had any shotgun shells he could give the appellant. Mr. Wright replied that he did not, but that his friend Robert Lewis probably did. They went to the home of Mr. Lewis, and his wife Wanda gave them the requested shotgun shells.
Later that night, the appellant and his wife were entertaining friends. The appellant complained of having the flu and retired to his bedroom. Once there, he turned out the light and let himself out of the window. He then got into his pickup truck and drove to Alabama.
Following Mrs. Haney's directions, the appellant parked his truck in a wooded area adjacent to the Haney home. The appellant then walked through the woods and up to the front door of the house. He put his loaded shotgun down on the porch and knocked on the door. Mr. Haney, who was in bed, heard the knocking and went to the door. The appellant told Mr. Haney that he had brought Mrs. Haney and the children back to Alabama, but that the truck had run out of gas and they were sitting on the side of the road. Mr. Haney agreed to help the appellant get some gas.
Mr. Haney changed his clothes and came outside, locking the front door behind him. At this time, the appellant fired the first shot at his victim, hitting him in the chest. The blast knocked Mr. Haney to the ground and while he was on the ground, *281 the appellant shot him again, this time grazing his ear. After this shot, the victim got to his feet and ran around to the back of his house, collapsing on the back porch steps and begging for his life. The appellant placed the shotgun on Mr. Haney's bottom lip and fired the last shot.
The appellant then rolled the victim onto his stomach and took his wallet out of his back pocket. On the way back to his pickup truck, he broke the light on the front porch. At approximately 11:00 p.m., the appellant stopped in Oxford, Alabama and called his wife and Mrs. Haney from a Waffle House restaurant to tell them that Mr. Haney was dead.
When the appellant arrived back home, he took the money, approximately $100, out of the wallet and Mrs. Haney took the victim's Social Security card. Mrs. Haney paid the appellant about $30 for his expenses on the trip and kept the remainder of the cash. The wallet was later destroyed. The shotgun was thrown into the river and was never recovered.
On January 2, 1984, Mrs. Haney contacted Lieutenant Billy Haney of the Talladega Police Department, the brother of Jerry Haney, the victim. Mrs. Haney requested that Lieutenant Haney go check on her husband because she had been trying to call him, but had been unable to get an answer. Lieutenant Haney went to the residence, where he discovered the body of his brother.
Jerry Wayne Haney's corpse was taken to the Department of Forensic Sciences for an autopsy. He had one shotgun wound to his left lower arm which penetrated the arm and entered his left chest. There was also a wound which grazed the victim's left ear. Finally, there was one shotgun wound to Haney's mouth which caused the mouth to be torn at the corners. This wound fractured almost every bone in the victim's skull, fractured the first two cervical vertebrae, and drove a tooth into Haney's spinal cord. It was this gunshot wound to the mouth that killed Jerry Haney.
When the investigation of the murder of Jerry Haney officially commenced, Jerry Henderson was the key suspect. On January 30, 1984, he reported to the police that his pickup truck had been broken into and his shotgun had been stolen. However, the circumstances surrounding the alleged theft were very suspicious.
For the next three years, the authorities searched for clues in the murder case of Jerry Wayne Haney. Finally, in the fall of 1987, Martha Henderson agreed to turn State's evidence. On September 9, 1987, law enforcement officials placed a "nagra unit" in the back seat of Mrs. Henderson's car to tape record conversations between her and her husband, the appellant. That night, Mr. and Mrs. Henderson got together and talked about the murder while sitting in Mrs. Henderson's car. The police got every word on tape.
On September 12, 1987, the appellant was arrested in Rome, Georgia, for the capital murder of Jerry Wayne Haney. Very early the next morning, the appellant confessed to the murder at the Floyd County jail in Georgia, and his confession was tape recorded.

I
The appellant first contends that his motion for change of venue should have been granted because, he argues, he could not receive a fair and impartial trial in Talladega County, Alabama, due to extensive pretrial publicity.
The principles controlling this issue were set out by our Supreme Court in Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985).
"Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *282 Franklin v. State, 424 So.2d 1353 (Ala. Crim.App.1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App.1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court....'
"The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim. App.1978)."
See also Donahoo v. State, 552 So.2d 887, 890 (Ala.Cr.App.1989); Moye v. State, 527 So.2d 158, 159-60 (Ala.Cr.App.1987).
The appellant, in support of his motion for change of venue, submitted copies of numerous articles which had appeared in the Talladega Daily Home, the local newspaper. The articles had appeared in the newspaper at various times during the four years between the date of the offense and the date appellant's trial began. The early articles made no mention of the appellant, since law enforcement officials were unable to make any arrests until over 3ฝ years after the murder. However, in all of the articles dating from September 1987 until the date of appellant's trial, the appellant's name was mentioned. In many of the articles, the appellant's name was mentioned merely as one of numerous individuals due to appear in court on a given date. Several of the articles, however, concerned the appellant's case exclusively.
This alone, however, does not necessarily mean that the appellant could not receive the fair and impartial trial guaranteed him by our constitution. Fike v. State, 447 So.2d 850, 857 (Ala.Cr.App.1983). Indeed, as this Court stated in Anderson v. State, 362 So.2d 1296, 1298-1300 (Ala.Cr.App. 1978):
"Newspaper articles, without more, are not evidence on a motion for change of venue; their effect must be shown. Beddow v. State, 39 Ala.App. 29, 96 So.2d 175 (1956), cert. denied, 266 Ala. 694, 96 So.2d 178 (1957), 355 U.S. 930, 78 S.Ct. 412, 2 L.Ed.2d 414 (1958).
"....
"... Generally newspaper articles which objectively report the commission of a crime, do not carry inflammatory headlines, and do not editorialize on the facts in a manner to inflame the community or create an atmosphere of prejudice are an insufficient basis on which to grant a motion for a change of venue. Gray v. State, 56 Ala.App. 131, 319 So.2d 750 (1975)."
Our examination of the articles submitted by the appellant reveals that all of the articles were objective and factual, detailing the crime and the developments in the appellant's case. These articles were simply insufficient to render the pretrial publicity surrounding this case "inherently suspect." Furthermore, of the 51 prospective jurors, only 17 had read or heard something about appellant's case. Further questioning, however, revealed that all of these jurors would be able to disregard this information and render a fair and impartial verdict based solely upon the evidence presented at trial. "Considering the answers of each prospective juror on voir dire examination we believe that the jury was impartial and adhered to its sworn duty to base its verdict upon the evidence adduced and the law as expounded by the court's instruction." Anderson, 362 So.2d at 1300. Therefore, the trial court correctly denied the appellant's motion for a change of venue.

*283 II
The appellant next contends that the trial court erred to reversal in refusing to allow individual voir dire examination of the prospective jurors. We disagree.
As Judge Patterson, writing for this Court, stated in Hallford v. State, 548 So.2d 526, 538-39 (Ala.Cr.App.1988), aff'd, 548 So.2d 547 (Ala.1989), cert. denied, ___ U.S. ___, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989):
"Even in capital cases, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination, and it is within the trial court's discretion whether to allow such a request. Bell v. State, 475 So.2d 601 (Ala.Cr.App.1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985); Raines v. State, 429 So.2d 1104 (Ala.Cr.App.), aff'd, 429 So.2d 1111 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). The decision of the trial court in denying individual voir dire examination will not be disturbed absent abuse of that discretion. We find no abuse here."
We also find no abuse of that discretion in the instant case. We note that the facts of this case differ from those in Brown v. State, 571 So.2d 345 (Ala.Cr.App.1990), wherein we reversed Brown's capital murder conviction and death sentence because of the trial judge's failure to conduct an adequate voir dire examination that would have allowed him to make an independent determination as to whether the jurors' impartiality had been destroyed by the extensive and prejudicial pretrial publicity surrounding the case, and because of his refusal to allow defense counsel to individually voir dire the jurors concerning their exposure to the pretrial publicity. Here, the record reveals that the trial court conducted voir dire of the prospective jurors in panels of 13. Thus, there was some individualization of the voir dire process. Moreover, once the trial court concluded its voir dire of the members of each panel, both the prosecutor and defense counsel were afforded an unlimited amount of time in which to conduct their own voir dire. This case also differs from Brown in that the pretrial publicity was not as extensive nor was it prejudicial to appellant's defense. Based on the foregoing, we conclude that no harm to the appellant resulted from the trial court's decision.

III
The appellant also contends that the trial court erred by failing to "propound reverse-Witherspoon[1] questions to prospective jurors" during voir dire. Specifically, he argues that his constitutional right to a fair and impartial jury was violated when the trial court death-qualified the jury (asked prospective jurors whether any of them so opposed the death penalty that they would never under any circumstances vote to impose the death penalty), but did not also "life-qualify" the jury (ask prospective jurors whether any of them so favored the death penalty that they would never vote for life imprisonment without the possibility of parole).
Our examination of the record reveals that, while qualifying each of the four panels of prospective jurors, the trial court instructed the jurors that "You must not have a fixed opinion against capital or penitentiary punishment to the extent that you would refuse to impose the death penalty regardless of the evidence produced and the Court's charge to the law, or you must not have a fixed opinion against penitentiary punishment." The trial court then asked the prospective jurors. "Do any of you have a fixed opinion against capital punishment?" After some additional remarks, the trial court turned the voir dire over to first the prosecuting and then the defense attorneys. At no time during voir dire did defense counsel object to the trial court's voir dire or request that the trial court "life-qualify" the prospective jurors. Moreover, defense counsel made no attempt to "life-qualify" the prospective jurors during his questioning of the jurors.
*284 The appellant's failure to preserve this issue, however, "while weighing against defendant as to any possible claim of prejudice, serves as no impediment to our scope of review pursuant to the `plain error' mandate in death penalty cases." Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983). Therefore, we must now consider whether the trial court's failure to "life-qualify" the prospective jurors constituted "plain error." Our Supreme Court has adopted federal case law defining plain error, holding that "[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Ex parte Womack, 435 So.2d 766, 769 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). See also Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985).
We find that the failure of the trial court to "life-qualify" the jury did not seriously affect the fairness of the proceedings against the appellant. With the exception of two prospective jurors who were unalterably opposed to capital punishment, all of the jurors indicated that they could follow the trial court's instructions regarding capital punishment. "The crucial inquiry is whether the venireman could follow the court's instruction and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied sub nom. Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116, 98 L.Ed.2d 74 (1987). Although dicta exists for the proposition that a trial court should "life-qualify" as well as "death-qualify" a jury, United States v. Van Scoy, 654 F.2d 257, 262-63 (3d Cir.), cert. denied, 454 U.S. 1126, 102 S.Ct. 977, 71 L.Ed.2d 114 (1981), we are unable to find any authority which requires a trial judge to do so. Indeed, the only case which directly addresses this issue holds contrary to appellant's position. See People v. Jones, 169 Ill.App.3d 883, 120 Ill.Dec. 563, 574, 524 N.E.2d 593, 604 (1988) (murder defendant's right to jury drawn from fair cross-section of community not violated when trial court death-qualified jury but did not "life-qualify" jury). In light of the fact that all but two of the jurors (the two opposed to capital punishment) indicated they could follow the court's instructions regarding capital punishment and that defense counsel had the opportunity during voir dire to "life-qualify" the jury but failed to do so, we find that the appellant was in no way harmed because the prospective jurors were not "life-qualified." Thus, no "plain error" occurred.

IV
The appellant further contends that the prosecutor violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by failing to disclose the deal with Martha Henderson pursuant to defense counsel's discovery motion, and by failing to inform the jury that the State's key witness, Martha Henderson, testified against Jerry Paul Henderson in an effort to avoid prosecution herself.
At trial, Martha Henderson testified as a prosecution witness and was questioned about a conversation between the appellant and Judy Haney to which she had been a witness. During the conversation, appellant related the details of how he had killed Jerry Haney to his wife and his sister-in-law, Judy Haney. During direct examination, no mention was made of "a deal" between Martha Henderson and the State whereby she would not be prosecuted in exchange for her testimony against appellant. Likewise, during cross-examination defense counsel failed to ask Mrs. Henderson if she was testifying pursuant to a deal made with Talladega County law enforcement officials. However, during the cross-examination of the very next State's witness, Investigator Dennis Surrett, evidence of a deal between Martha Henderson and law enforcement officials was made known to the jury. Indeed, when asked whether a deal was made, Investigator Surrett readily admitted that the district's attorney's office had agreed not to prosecute Ms. Henderson in exchange for her testimony against the appellant and Judy Haney.
*285 The issue of whether the prosecutor violated the rule of Brady is raised for the first time on appeal. Moreover, although the record contains discovery motions filed by both parties, there is nothing in the record to indicate that these motions were ever ruled upon or that the trial court even entered a discovery order. Thus, nothing is preserved for review. Cross v. State, 536 So.2d 155, 157 (Ala.Cr.App.1988); Jackson v. State, 484 So.2d 1174, 1179 (Ala.Cr. App.1985). As discussed in Part III, however, because this is a case in which the death penalty was imposed, we must now determine whether the prosecutor's actions constituted plain error.
There is no question that the appellant was entitled to this information. "Impeachment evidence, ... as well as exculpatory evidence, falls within the Brady rule. See Giglio v. United States, 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972)." United States v. Bagley, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985). "It is now clear that Brady imposes an affirmative duty on the prosecution to produce at the appropriate time the requested evidence which is materially favorable to the accused either as direct or impeaching evidence." Firth v. State, 493 So.2d 397, 403 (Ala.Cr.App.), writ quashed, 493 So.2d 405 (Ala.1986), quoting Williams v. Dutton, 400 F.2d 797 (5th Cir.1968), cert. denied, 393 U.S. 1105, 89 S.Ct. 908, 21 L.Ed.2d 799 (1969). "[W]here defendant has timely requested the production of exculpatory evidence that is material to his defense and the trial judge has ordered that such evidence be produced, Brady, supra, and Rule 18.1, A.R.Crim.P., require that the evidence be produced at a reasonable time before trial." Ex parte Brown, 548 So.2d 993, 995 (Ala.1989). In Brown, however, the alleged discovery order violation was preserved at trial for appellate review, not reviewed under the plain error standard being applied in the instant case. As previously stated, "[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity affect of the judicial proceeding." Ex parte Womack, supra, 435 So.2d at 769.
The State argues that Martha Henderson's deal was made known to the appellant's defense counsel, and it was defense counsel's choice to impeach her by cross-examining Investigator Surrett about the deal rather than questioning Martha herself. The appellant disputes this, contending that he had no prior knowledge of the deal, and that it was only by mere chance that he chose to question Investigator Surrett about the existence of a deal between Martha Henderson and law enforcement officials. Our examination of the record leaves us unable to determine which of these contentions, or indeed, if either, is correct. Nevertheless, one thing is certain. Evidence of Martha Henderson's deal with law enforcement officials in order to avoid prosecution herself was made known to the jury. Therefore, assuming, arguendo, that the prosecution failed to disclose this information, such error did not seriously affect the fairness or integrity of the proceedings against the appellant. Just as in Ex parte Firth, 493 So.2d 405 (Ala.1986), "[t]he promise of immunity in question here was brought out by defense counsel at trial, and thus they were `fully able to make whatever use of it they desired during closing argument to the jury.' United States v. Walker, 720 F.2d 1527 (11th Cir.1983) [cert. denied sub nom. Gustin v. United States, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984) ]." See also United States v. Bruner, 657 F.2d 1278 (D.C.Cir.1981). Thus, no plain error exists with regard to the prosecutor's actions.

V
The appellant next contends that various aspects of his trial violated the rule of Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).
The appellant first argues that the seating of Billy Haney, brother of the victim, at the prosecutor's counsel table prejudiced his defense and prevented him from receiving a fair and impartial trial. The presence of a victim seated at the counsel table for the prosecution is specifically provided *286 for by "The Alabama Crime Victims' Court Attendance Act," codified at งง 15-14-50 et seq., Code of Alabama 1975. This act gives victims of a criminal offense the right to be present in the courtroom and seated alongside the prosecutor during the trial of the individual charged with that offense.
The appellant argues, however, that this statute is unconstitutional generally, or alternatively, with regard to capital murder cases specifically. This argument has been previously addressedโand rejectedโby this Court in both capital as well as non-capital cases. In Crowe v. State, 485 So.2d 351, 362-63 (Ala.Cr.App.1984), rev'd on other grounds, 485 So.2d 373 (Ala.1985), cert. denied, 477 U.S. 909, 106 S.Ct. 3284, 91 L.Ed.2d 573 (1986), a capital murder case in which the death penalty was imposed, this Court specifically rejected the notion that the seating of the victim's widow at counsel table for the prosecution violated any constitutional rights of the accused. Likewise, in Anderson v. State, 542 So.2d 292, 304-05 (Ala.Cr.App.1987), writ quashed, 542 So.2d 307 (Ala.1989) cert. denied, ___ U.S. ___, 110 S.Ct. 116, 107 L.Ed.2d 77 (1989), a capital murder case in which life imprisonment without possibility of parole was imposed, we rejected this argument, holding as follows:
"Furthermore, under ง 15-14-55, Code of Alabama (1975), `A victim of a criminal offense shall be exempt from the operation of rule of court, regulation, or statute or other law requiring the separation or exclusion of witnesses from court in criminal trials or hearings.' Under ง 15-14-56(a), `[w]enever a victim is unable to attend such trial or hearing or any portion thereof by reason of death... the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article.' Although the appellant argues that these statutes have no application in his case, because the offense occurred prior to their enactment, the defendant's trial took place after its enactment, and therefore the statute applies to this case. See, for example, Loper v. State, 469 So.2d 707, 712 (Ala.Cr.App.1985)."
The appellant argues that since Crowe was decided prior to Booth and South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), our decision in Crowe is no longer controlling. However, in light of our 1987 decision in Anderson, which was reviewed by the Alabama Supreme Court in 1989, this contention cannot prevail. Moreover, as pointed out by the State in its brief, Booth and Gathers deal only with the presentation of evidence and argument of counsel at a capital sentence proceeding regarding the character of the victim, impact on the victim's family, or the opinion of the victim's family as to the appropriate sentence to be imposed. Neither of these decisions pertains to the presence of a victim's family member at counsel table, and none of the cases cited by the appellant applies either of these cases in this way.
The appellant also contends that he was prejudiced because Billy Haney was introduced to the jury. However, in both Crowe and Anderson this Court has approved the seating of a member of the victim's family alongside the prosecutor. Logically, it would therefore follow that there is nothing wrong with introducing that person to the jury. Moreover, we find no reversible error in a brief statement suggesting that the prosecuting attorney speaks for the victim's family. See State v. McNeil, 324 N.C. 33, 375 S.E.2d 909, 918 (1989), vacated on other grounds, ___ U.S. ___, 110 S.Ct. 1516, 108 L.Ed.2d 756 (1990), (no violation of Booth when prosecutor said he spoke for "two dead ladies who cannot speak").
The appellant next contends that the trial court erred in allowing Billy Haney to testify at the guilt stage. Haney's testimony consisted of telling the jury that on the morning of January 2, 1984, he received a telephone call from his sister-in-law Judy Haney, who said that she was in Georgia at her sister's and that she had been trying to reach her husband by telephone, but had been unable to do so. Billy Haney then drove to the Haney residence *287 and found his brother's body on the porch. As Billy Haney was the first person to discover that his brother had been fatally wounded, his testimony was clearly relevant to the guilt phase proceedings. Indeed, in Rutledge v. State, 523 So.2d 1087, 1091 (Ala.Cr.App.1987), rev'd on other grounds, 523 So.2d 1118 (Ala.1988), this Court, in holding that similar testimony by a family member relevant to the crime was proper at the sentencing portion of a capital murder trial, noted that "[c]learly, this testimony was properly admissible in the guilt phase."
The appellant next argues that he was denied a fair and impartial trial because of "emotional outbursts" by family members of the victim. The complained-of outbursts consisted of the victim's brother, Billy Haney, breaking down on the witness stand during his testimony and another outburst that occurred during the State's closing guilt phase argument.
We have previously considered and rejected the argument that crying by a victim's family members in a capital murder case was unduly prejudicial to appellant's defense. In Crowe, supra, 485 So.2d at 363, and Luke v. State, 444 So.2d 393, 396 (Ala.Cr.App.), aff'd, 444 So.2d 400 (Ala. 1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984), this Court refused to reverse based on incidents of crying by a victim's family members.
Moreover, the disturbance caused by family members during closing argument does not require reversal for several reasons. First, the record does not show the exact nature of what occurred during closing argument, and thus, the prejudicial nature of the remarks can only be guessed at. Second, the trial court promptly instructed the jury to disregard this occurrence. As we have stated on many previous occasions, there is a presumption against error where the trial court immediately instructs the jury to disregard a remark or question. See, e.g., Flanagan v. State, 533 So.2d 637, 645 (Ala.Cr.App.1987); Ringer v. State, 489 So.2d 646, 650 (Ala.Cr.App.1986). Third, defense counsel indicated to the trial court that he was satisfied with the court's curative instructions. Cf., Ex parte Bush, 431 So.2d 563, 565 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983) (fact that defendant's attorney did not object suggests no prejudice and thus no plain error).
Finally, the appellant complains that several portions of the prosecutor's closing arguments were in violation of Booth and Gathers. The prosecutor mentioned the importance of the case to the victim's family, the suffering of the family, that he represented the family, and that he could have called the victim's family to the stand. However, Booth and Gathers pertain only to evidence or argument presented at the sentence phase of a capital trial. The first three of these remarks occurred during the guilt phase; thus, Booth and Gathers have no bearing on these remarks.
Moreover, the complained-of remarks which were made during the guilt stage of appellant's trial were not objected to at trial. Thus, they must be reviewed under the "plain error" standard. As stated in an earlier portion of this opinion, "[p]lain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Womack, supra, 435 So.2d at 769. In reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not view the allegedly improper acts in the abstract. Whitlow v. State, 509 So.2d 252, 256 (Ala.Cr. App.1987); Wysinger v. State, 448 So.2d 435, 438 (Ala.Cr.App.1983). This Court has also held that statements of counsel in argument to the jury must be viewed as in the heat of debate, and such statements are usually valued by the jury at their true worth, and are not expected to become factors in the formation of the verdict. Orr v. State, 462 So.2d 1013, 1016 (Ala.Cr. App.1984); Sanders v. State, 426 So.2d 497, 509 (Ala.Cr.App.1982). For these reasons, it is unlikely that any impropriety in the State's argument could have affected the jury's verdict.
*288 Having determined that the prosecutor's remarks during the guilt phase of the appellant's trial did not constitute plain error, we must now determine the propriety of the prosecutor's brief reference to the opinions of the victim's family which occurred during the sentencing phase of the appellant's trial. Again, this remark was not objected to at trial. Thus, reversal would be required only if we were to find that this remark constituted plain error.
No such error occurred in the case at bar. As several other jurisdictions have recognized, a brief mention of the victim or the victim's family in closing argument does not constitute reversible error under Booth. See, e.g., Bertolotti v. Dugger, 883 F.2d 1503, 1524 n. 10 (11th Cir.1989); Bryne v. Butler, 845 F.2d 501, 510-12 (5th Cir.1988); People v. Miranda, 44 Cal.3d 57, 241 Cal.Rptr. 594, 744 P.2d 1127, 1162 (1987), cert. denied, 486 U.S. 1038, 108 S.Ct. 2026, 100 L.Ed.2d 613 (1988). Accordingly, the appellant's contention does not prevail.

VI
The appellant next contends that the trial court erred in preventing defense counsel from referring to, or presenting evidence of, the victim's "violent" behavior toward not himself, but a third partyโ Judy Haney, the victim's wife and the appellant's sister-in-law. Specifically, the appellant argues that the trial court's actions prevented him from presenting evidence to support his claim of self-defense.
"The general rule in Alabama is that if the evidence in a prosecution for homicide tends to show that the accused acted in self-defense, [then] he has the right to prove the victim's bad general reputation for peace and quiet, for violence, or a like trait, as tending to show that the victim was the aggressor." Williams v. State, 531 So.2d 49, 51 (Ala.Cr.App.1988) (emphasis supplied). See also Laffity v. State, 423 So.2d 280 (Ala.Cr.App.1982); Bankston v. State, 358 So.2d 1036 (Ala.Cr.App.1977), rev'd, 358 So.2d 1040, 1041 (Ala.1978); Cole v. State, 337 So.2d 40 (Ala.Cr.App.), cert. denied, 337 So.2d 47 (Ala.1976). Moreover, as we have previously held:
"`[A] person is not justified in using deadly physical force upon another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety: (1) By retreating.' Alabama Code 1975, ง 13A-3-23(b). `As a general rule, the accused is not entitled to have his claim of self-defense submitted to the jury if the undisputed evidence shows clearly any of the following: ..., that the accused was able to retreat....' C. Gamble, McElroy's Alabama Evidence ง 457.02(5)(a) (3rd ed. 1977). `In the absence of evidence warranting a finding both that the accused was in actual or apparent imminent peril and that he was unable to retreat, it is assumed that he was not in such peril and that he was able to retreat.' McElroy at ง 457.02(5)(b). `Where the accused claims the [use of deadly physical force] was in self-defense, the onus rests on him to show that he could not safely retreat without increasing or apparently increasing his peril.' McDonald v. State, 340 So.2d 80, 84 (Ala.Cr.App.), cert. denied, 340 So.2d 84 (Ala.1976).
"....
"... `To justify conduct through a claim of self defense, the accused must neither provoke nor encourage the difficulty.... Additionally, some form of retreat is required to establish a claim of self defense.' Finchum v. State, 461 So.2d 37, 39 (Ala.Cr.App.1984) (citations omitted). `[O]ne who claims justification in the use of force must not have brought on the necessity of using it; he must have been entirely free from fault.' Commentary to Alabama Code 1975, ง 13A-3-23."
Weaver v. State, 500 So.2d 1278, 1279 (Ala. Cr.App.1986).
In Williams, the defendant attempted to present evidence of the violent propensities of his victim at his capital murder trial. The trial court refused to allow such evidence. This court affirmed, holding that appellant failed to establish sufficient evidence of self-defense to allow him to go into the victim's reputation for violence. *289 531 So.2d at 51. Likewise, the defendant in Bankston sought to establish the victim's reputation for violence through the testimony of three witnesses. 358 So.2d at 1039. The trial court refused to allow the introduction of such evidence, and this Court affirmed. 358 So.2d at 1039-40. However, our Supreme Court viewed the case in a different light and reversed, not because it found the principle of law as to self-defense inapplicable, but because it believed the evidence of self-defense presented at trial was sufficient to make out a jury question and thus, the testimony concerning the victim's violent reputation should have been admitted. In its opinion, the Supreme Court summarized the law of self-defense as follows:
"Ordinarily, the character or reputation of the deceased in a murder trial is not involved as an issue, and proof relative thereto is generally inadmissible. Webster v. State, 207 Ala. 668, 93 So. 545 (1922). Such a rule of law is weighed in the consideration that the law does not distinguish between the killing of an evil person and that of a saintly person. Eiland v. State, 52 Ala. 322 (1875). However, evidence of the character or reputation of the deceased for turbulence, violence and bloodthirstiness should be received when it illustrates or explains words or acts of the deceased at the time of the killing or to show that the killing was in self defense. Eiland v. State, supra. The rationale of the rule allowing such evidence is that words spoken or actions taken by a person with a reputation for turbulence, violence, and bloodthirstiness may convey a meaning and intent different from the same words and actions of someone else. Seemingly innocent actions of the deceased may take on a different significance when considered in the light of his or her character.
"It is well understood that evidence of the deceased's turbulent, violent, and bloodthirsty character is not competent absent some evidence tending to show that the killing was in self defense; that is, some overt act or hostile demonstration on the part of the deceased. Farley v. State, 279 Ala. 98, 182 So.2d 364 (1966); Wright v. State, 252 Ala. 46, 39 So.2d 395 (1949); Wells v. State, 187 Ala. 1, 65 So. 950 (1914); Green v. State, 143 Ala. 2, 39 So. 362 (1904). Such evidence is not available to the defendant if he or she is the aggressor. Sanders v. State, 242 Ala. 532, 7 So.2d 483 (1942); Rutledge v. State, 88 Ala. 85, 7 So. 335 (1889). However, on all doubtful questions of who is the aggressor, the bad character of the deceased for turbulence and violence should be admitted. De Arman v. State, 71 Ala. 351 (1882). When the evidence on self defense is sufficient to go to the jury, evidence of the deceased's bad character for turbulence and violence must be accepted. Brooks v. State, 263 Ala. 386, 82 So.2d 553 (1955); McGuff v. State, 248 Ala. 259, 27 So.2d 241 (1946); Rutledge v. State, supra."
358 So.2d at 1041-42.
These same principles apply when the evidence sought to be admitted is the victim's violence toward third parties. Calhoun v. State, 460 So.2d 1376 (Ala.Cr.App. 1983), rev'd, 460 So.2d 1378 (Ala.1984). Thus, the issue to be decided is whether, at the time the offer of proof was made, there was evidence of self-defense sufficient to go to the jury.
The answer to this question is no. Our examination of the record convinces us that the appellant has failed to meet the burden of proving self-defense. Indeed, the evidence, including the appellant's statement to law enforcement officials, clearly established that the appellant was the aggressor. He and the victim's wife planned the murder, and the appellant agreed to carry it out in exchange for $3,000. The appellant made several phone calls looking for the right type of ammunition. Next, he invited people to his home so that he would have an alibi. Finally, on the night in question; he pleaded illness to his guests and retired to his bedroom; he then climbed out the window, drove to the victim's home in Talladega County, lured the victim outside, and shot him three times while the victim pleaded for his life. Because *290 there was no evidence of self-defense and the appellant's offer of proof did not establish such evidence, the trial court correctly instructed defense counsel to exclude any reference to the victim's reputation for violence from his opening argument. The appellant's failure to establish the admissibility of this evidence through his offer of proof makes this case distinguishable from Ex parte Baldwin, 456 So.2d 129 (Ala. 1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985), upon which he relies. Wide discretion is given to the trial court in regulating the argument of counsel. Miller v. State, 380 So.2d 1011, 1012 (Ala.Cr. App.1980). This includes opening argument. Mullis v. State, 258 Ala. 309, 62 So.2d 451, 453 (1952). Because the victim's reputation for violence is not generally admissible, the trial court did not abuse its discretion in not allowing argument on this point. Likewise, when the appellant sought to develop this issue during the cross-examination of Martha Henderson, there was no evidence of self-defense. In fact, her testimony established that the appellant, and not the victim, was the aggressor. Since Ms. Henderson's testimony did not establish that the appellant was acting in self-defense, any prior acts of violence would not have been admissible during Ms. Henderson's cross-examination.
Both the appellant and the State discuss at length the test for admissibility of prior bad acts set out in Weaver v. State, 402 So.2d 1099 (Ala.Cr.App.1981), and based on ง 63.01(3) of McElroy's Alabama Evidence (3d ed. 1977). We would note that this test comes into play only after the accused has established some proof that he, in fact, was acting in self-defense. We would further note that evidence of the victim's prior acts of violence is to be found in the statement the appellant gave to law enforcement officials and that was received into evidence at trial. Therefore, no reversible error occurred with regard to this issue.

VII
The appellant also contends that the trial court abused its discretion when it exempted Dr. Joseph Embry, a forensic pathologist, from the rule excluding witnesses from the courtroom during a criminal prosecution and allowed him to be present when Mike Lee, the medical examiner who aided Dr. Henry Santina during the autopsy of the victim, testified concerning the details of the autopsy. Specifically, the appellant argues that because the purpose of the rule is to obviate as far as possible one witness's trying to make his testimony consistent with that of another, Dr. Embry, who testified concerning the victim's cause of death, should have been excluded from the courtroom during Lee's testimony as to this same issue.
We would first note that the State's method of proving the victim's cause of death differs somewhat from the normally accepted method of doing so because of circumstances having nothing to do with this case. Dr. Henry Santina, the forensic pathologist who performed the autopsy on the victim's body, had retired and moved to France by the time this case came to trial. Consequently, the State was unable to compel the presence of Dr. Santina, and he refused to return voluntarily. In order to prove the victim's cause of death, the State called Mike Lee, then Lawden Yates, and finally, Dr. Joseph Embry. All three were employees of the Alabama Department of Forensic Sciences. Lee testified to the procedures used by Dr. Santina while performing the autopsy. Yates, area head of Dr. Santina's division and custodian of all records, testified that the autopsy report completed by Dr. Santina was a document that was kept in the normal course of business by the Department of Forensic Sciences. The autopsy reportโwith Dr. Santina's expert opinion as to the victim's cause of death deletedโwas then received into evidence as a business record. Dr. Embry was then called to testify and, after being qualified as an expert, was asked to give his opinion as to the victim's cause of death based on the facts as testified to by Mike Lee and on the autopsy report introduced as a business record. Dr. Embry then testified that, in his opinion, the victim's cause of death was a gunshot wound *291 to the face.[2]
"Although an expert witness may not express an opinion based on the opinion of another expert, he may base his opinion upon the facts testified to by another expert." Johnson v. State, 378 So.2d 1164, 1170 (Ala.Cr.App.), writ quashed, 378 So.2d 1173 (Ala.1979). The trial court felt that in order for Dr. Embry to be able to give an opinion as to the cause of death, it was necessary for him to hear Mike Lee's testimony. This was the reason Dr. Embry was exempted from the trial court's sequestration order. "Where the rule for the exclusion of witnesses from the courtroom is invoked, it is within the sound discretion of the trial court to allow any one of the witnesses to remain in the courtroom during the examination of the others and the exercise of this discretion is not reviewable on appeal." (Citations omitted.) Jackson v. State, 502 So.2d 858, 863 (Ala.Cr.App. 1986); Hall v. State, 500 So.2d 1282, 1291 (Ala.Cr.App.1986); Chesson v. State, 435 So.2d 177, 179 (Ala.Cr.App.1983); Young v. State, 416 So.2d 1109, 1111 (Ala.Cr.App. 1982). We would note, however, that Dr. Embry's exemption was not necessary, because he could have also based his opinion on facts that are assumed in hypothetical questions. Phillips v. Emmons, 514 So.2d 1369, 1371 (Ala.1987); Wesley v. State, 575 So.2d 108 (Ala.Cr.App.1989).
Even if we were to find that it was error to exempt Dr. Embry from the rule, such error would have been harmless in light of the fact that Mike Lee, also qualified as an expert based on his experience and training, could, and did, give his opinion as to the victim's cause of death. See, e.g., Lee v. State, 265 Ala. 623, 93 So.2d 757, 761 (1957); Snead v. State, 251 Ala. 624, 38 So.2d 576, 579 (1948); Phillips v. State, 248 Ala. 510, 28 So.2d 542, 546 (1947); Reynolds v. State, 346 So.2d 979, 982 (Ala.Cr. App.), cert. denied, 346 So.2d 986 (Ala. 1977).
We would further note that the appellant's reliance on Ex parte Faircloth, 471 So.2d 493 (Ala.1985), is misplaced, because the issue in Faircloth was whether a witness who violates a sequestration order should be allowed to testify. Dr. Embry did not violate a sequestration order. Accordingly, the appellant was not prejudiced by the trial court's exemption of Dr. Embry from its sequestration order.

VIII
The appellant further contends that his Fourth Amendment rights against an unreasonable search and seizure were violated when the State obtained, without his consent and without a search warrant, the telephone records of his home telephone from Southern Bell Telephone Company and introduced them into evidence as part of its case-in-chief.
The only objection made by defense counsel at trial was one concerning the proper predicate for introduction of business records. Such an objection does not preserve the issue now raised for appellate review, as a specific objection waives all grounds not specified. Hinton v. State, 548 So.2d 547, 557 (Ala.Cr.App.1988), aff'd, 548 So.2d 56288 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Murray v. State, 494 So.2d 891, 893 (Ala.Cr.App.1986). However, as discussed previously, because this is a death case we must determine whether introduction of these records constituted plain error.
The appellant's allegation of error must fail. His telephone records were the property of Southern Bell Telephone Company. They were produced pursuant to a subpoena issued to this telephone company and, after a proper predicate was laid, were received into evidence under the business record exception to the hearsay rule. See Gwynne v. State, 499 So.2d 802, 809 (Ala. Cr.App.1986); and Brooks v. City of Birmingham, 488 So.2d 19, 22 (Ala.Cr.App. 1986) (call-trace information provided by *292 telephone company is admissible as records kept in regular course of business).
Moreover, application of the Fourth Amendment depends on whether the person invoking its protection can claim a "legitimate expectation of privacy" that has been invaded by the State's action. The test for determining what constitutes a "legitimate expectation of privacy" is: 1) has there been a subjective expectation exhibited; and 2) is the expectation one that society will recognize as reasonable. Smith v. Maryland, 442 U.S. 735, 740, 99 S.Ct. 2577, 2580, 61 L.Ed.2d 220 (1979). The United States Supreme Court has made it clear that a distinction exists between police action that obtains the contents of an individual's telephone conversation and those actions that result in obtaining only the telephone numbers to which an individual has placed or from which he has received calls. No "legitimate expectation of privacy" exists, and, thus, no Fourth Amendment violation occurs when telephone numbers or telephone records only are obtained. See Smith v. Maryland, supra, 442 U.S. at 745-46, 99 S.Ct. at 2582-83 (no Fourth Amendment violation in recording telephone numbers from defendant's home); Reporters Committee for Freedom of the Press v. American Telephone & Telegraph, 593 F.2d 1030, 1043-44, (D.C.Cir.1978), cert. denied, 440 U.S. 949, 99 S.Ct. 1431, 59 L.Ed.2d 639 (1979) (telephone records). See also United States v. Miller, 425 U.S. 435, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976) (bank records not subject to Fourth Amendment). Based on these authorities, we conclude that the Fourth Amendment was not implicated in the appellant's subpoenaed telephone records. Accordingly, no plain error exists.

IX
The appellant next contends that his spousal privilege was violated by the trial court's allowing his wife, Martha Henderson, to disclose the contents of confidential marital communications. The record indicates that Ms. Henderson testified on two separate occasionsโonce during the guilt phase and once during the sentencing phase of appellant's trial.
At the outset of her testimony, Martha Henderson indicated that she was aware of her privilege not to testify against her husband, Jerry Paul Henderson, and that she was freely waiving that privilege. Ms. Henderson then testified that when the appellant returned from Talladega on January 2, 1984, she, the appellant, and Judy Haney had a conversation wherein the appellant informed the two women that he had killed Judy Haney's husband, took his wallet, and then returned to Georgia. During this conversation, the appellant produced the wallet, and he and Ms. Haney divided the contents. The appellant also provided his wife and sister-in-law with the gruesome details of the shooting, including how the wounded victim begged him to spare his life.
Alabama law provides that a spouse is a competent witness against another spouse if the testifying spouse agrees to testify. ง 12-21-227, Code of Alabama 1975. This statute, however, "makes no mention of the common law privilege for confidential communications between husband and wife and can have no effect on the independent nature of that privilege" since the privilege rests with the communicating spouse. Arnold v. State, 353 So.2d 524, 526 (Ala.1977). "The confidential communications privilege is based on the premise of preservation of the family. `The privilege for confidential marital communications is thought to do this by encouraging the spouses to be frank and open with each other by protecting marital privacy.'" (Citations omitted.) State v. Browder, 486 So.2d 504, 506 (Ala. Cr.App.1986). In Arnold, however, our Supreme Court went on to hold that, "It is the confidential nature which is implicit in any application of the privilege, and it is well-settled that a statement made in the presence of (or directed at) a third party lacks that requisite confidentiality between spouses." 353 So.2d at 527, citing Caldwell v. State, 146 Ala. 141, 41 So. 473 (1906). In Arnold, the wife overheard her husband's telephone conversation with a third party. The Supreme Court held that this communication was not excludable under the privilege. 353 So.2d at 527. Based *293 on the foregoing, this portion of Martha Henderson's testimony was not covered by the marital privilege because of the presence of a third partyโJudy Haney. See also Epps v. State, 408 So.2d 562, 565 (Ala.Cr.App.1981); Bailey v. State, 398 So.2d 406, 412 (Ala.Cr.App.1981).
The appellant argues, however, that Arnold is distinguishable from the case at bar because the conversation in Arnold was overheard accidentally. This interpretation of Arnold is too restrictive, as this Court's decision in State v. Browder, supra, indicates. In Browder, we made it clear that when the communication is made in the presence of a third party, the communication is no longer confidential because the reason for the rule, preservation of the family, no longer applies.
Perhaps anticipating our response to his argument, the appellant also seeks to distinguish Browder, on the grounds that unlike the appellant's husband in Browder, Martha Henderson was not an accomplice to the crime. In Browder, however, this Court found that the testifying spouse was not an accomplice to the murder made the basis of the indictment in that case. The spouse did, however, aid in destroying and concealing physical evidence after the fact. 486 So.2d at 507. In addressing this issue, Judge Patterson, writing for the Court, stated as follows:
"In United States v. Neal, 743 F.2d 1441, 1446 (10th Cir.1984), cert. denied, 470 U.S. 1086, 105 S.Ct. 1848, 85 L.Ed.2d 146 (1985), the court stated:
"`If ... the spouse who did not conspire to or participate in the commission of the crime nevertheless thereafter, with knowledge of the fact that the other spouse did commit the crime, actively, by overt acts, participates in the "fruits" of the crime or "covers up" evidence thereof by any means, then the marital communications privilege does not apply to protect the spouse who committed the crime from voluntary incriminating testimony of his spouse who actively participated as an accessory-after-the-fact.'
"We agree with the decision reached in Neal and adopt this language for guidance in this and future cases. The testimony of Maddox clearly reveals that he helped the defendant destroy the jacket and dispose of the pistol. Therefore, the confidential communications privileges cannot be invoked to protect Browder, who allegedly committed the crime, from the voluntary incriminating testimony of Maddox. Once Maddox became a participant in the crime, albeit after the fact, all communications between husband and wife pertaining to the crime were admissible and not subject to the confidential communications privilege. In our view Maddox became a participant in the crime concurrent with Browder's statement that she had killed Baber, and her act of throwing the money on his chest. Maddox's participation is evidenced by his admitted overt acts of aiding Browder in disposing of physical evidence of the crime. The statement made by Browder at the hospital two days prior to the killing was a confidential communication protected by the privilege. There is nothing in the record before us to suggest that Maddox encouraged, acquiesced in, or aided Browder's acts in any way, until after the alleged murder occurred. Therefore, only those communications which occurred after Maddox became a participant in the crime are admissible."
486 So.2d at 507-08.
Here, just as in Browder, Martha Henderson became a participant in the crime when the appellant told her he had killed Jerry Haney, and she concealed this fact from law enforcement officials until such time as she was granted immunity from prosecution. Accordingly, the trial court correctly received Mrs. Henderson's testimony into evidence during the guilt phase of her husband's trial.
The appellant also claims that the State violated the marital communication privilege by the alleged introduction of a tape-recorded conversation between Martha and himself. This recording was received into evidence during Martha *294 Henderson's testimony in the penalty phase of appellant's trial.
We would first note that our decision in Browder, supra, also applies to this tape-recorded conversation. Our examination of the record also reveals that prior to the recording's reception into evidence, appellant took the stand and testified concerning portions of the taped conversation. Subsequently, and over objection, the State was allowed to play the remaining portion of the taped conversation between appellant and his wife, Martha Henderson.
Based on these facts, we find ourselves in agreement with the State that once the appellant took the stand and testified to a portion of the taped conversation, he waived his privilege and thus entitled the State to play the entire conversation to the extent that it was inconsistent with his previous testimony. Indeed, several decisions by the United States Supreme Court have made it clear that a defendant may make otherwise inadmissible evidence admissible as impeachment evidence by his prior testimony. United States v. Havens, 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980) (illegally obtained evidence allowed to impeach statement on cross-examination related to direct); Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (confession without Miranda warnings may be used in cross-examination if otherwise voluntary and defendant's direct testimony is inconsistent); Walder v. United States, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (evidence from illegal search admissible to impeach defendant's testimony in subsequent trial). Strict rules of evidence are not applicable to sentencing hearings. "Any evidence which has probative value and is relevant to sentence shall be received at the sentence hearing regardless of its admissibility under the exclusionary rules of evidence, provided that the defendant is accorded a fair opportunity to rebut any hearsay statements." ง 13A-5-45(d), Code of Alabama 1975. This evidence was clearly relevant to sentencing. Moreover, the appellant had ample opportunity to rebut it. Thus, the trial court did not err by allowing the State to play the entire taped conversation between the appellant and his wife.

X
The appellant also contends that the admission into evidence of Martha Henderson's testimony violated his constitutional rights. More specifically, the appellant asserts that Mrs. Henderson's testimony was irrelevant, immaterial, and highly prejudicial hearsay.
Martha Henderson testified, in pertinent part:
"Q. Did he say what Jerry Haney was doing while he was on the porch? Did he say that Jerry Haney said anything to him at that time?
"A. Told him to get help and not to shoot him anymore, and said that he had to do it because he couldn't leave him alive, because he had done saw who he was."
We would first note that defense counsel never objected to Martha Henderson's testimony. However, this testimony must still be reviewed pursuant to the plain error standard of review.
Because where Martha Henderson testified as to both what her husband told her about the murder and the victim's last words, this issue must be reviewed under a two-tiered analysis: first, whether the victim's statement was admissible; and second, whether the appellant's statements to his wife Martha Henderson concerning the incident were admissible.
It is well settled in Alabama that statements made by the deceased are not competent evidence against a defendant in a murder trial unless they were made in his presence, are admitted in evidence as part of the res gestae, or constitute a dying declaration. Lovett v. State, 491 So.2d 1034, 1036 (Ala.Cr.App.), cert. denied, 491 So.2d 1039 (Ala.1986); Hargove v. State, 368 So.2d 335, 337 (Ala.Cr.App.1979). In light of the facts of this case, the statement of the deceased was admissible as part of the res gestae and as a dying declaration. However, we must now determine if Martha Henderson could testify concerning this statement because her knowledge *295 of the statement came not from firsthand knowledge, but from what the appellant told her after the fact. We find that she could. Any conduct or declaration of the accused having relation to the offense charged and indicating a consciousness of guilt, is admissible against him at trial. Nicks v. State, 521 So.2d 1018, 1028 (Ala. Cr.App.1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988).
Finally, even if Ms. Henderson's testimony had been incorrectly received into evidence, such occurrence would still be harmless. The victim's plea for his life was uncontested in the appellant's confession, which was received into evidence during the guilt phase of his trial. The harmless error rule applies in capital cases, and a defendant in a criminal prosecution is not prejudiced by the testimony of a witness which related to uncontradicted matters. Musgrove v. State, 519 So.2d 565, 575 (Ala. Cr.App.1986), aff'd, 519 So.2d 586 (Ala. 1987), cert. denied, 486 U.S. 1036, 108 S.Ct. 2024, 100 L.Ed.2d 611 (1988). Accordingly, no error resulted from Martha Henderson's testimony.

XI
The appellant contends that the trial court erred in admitting into evidence the statement made by him while he was in the custody of the police. Specifically, he challenges the voluntariness of this statement, alleging that: (1) the police officers continued their interrogation after he had asserted his Miranda[3] right to remain silent; and (2) he was under the influence of alcohol and/or drugs upon his arrest.
At trial, the following exchange occurred during direct examination of Dennis Surrett, the police officer who took the appellant's statement:
"Q. Dennis, I'll ask you if on September 12th and September 13th of 1987 if you had an occasion to see the defendant, Jerry Paul Henderson?
"A. Yes, sir, I did. It was shortly after midnight on September 13, 1987.
"Q. Okay. And where would that have been?
"A. Floyd County Jail, Floyd County, Georgia."
"Q. And did you advise the defendant of his constitutional rights on that occasion?
"A. Yes, sir, I did.
"Q. And did you use anything to assist you in advising him of those rights?
"A. Yes, sir, I did.
"....
"Q. And give us the time and the place and who all was present.
"A. It would be myself and Jerry Henderson.
"Q. If you will please sir, would you tell us what you advised him of on that occasion.
"A. I asked him to listen to me closely because I was about to advise him of his rights and I advised him as follows: `You have the right to remain silent. Anything you say can and will be used against you in a Court of law. You have the right to talk to a lawyer and have him present with you while you are being questioned. If you cannot afford to hire a lawyer, one will be appointed to represent you if you wish one. You can decide at any time to exercise these rights and not answer any questions or make any statements.' I further advised him of the waiver, `And do you understand each of these rights that I have explained to you?' He replied yes. `Having these rights in mind, do you wish to talk to us now?' And he again answered yes.
"Q. And did he make a statement to you?
"A. Yes, sir, he did."
Before an accused's confession can be received into evidence against him, both voluntariness and a Miranda predicate must be shown. Whitlow v. State, 509 So.2d 252, 254 (Ala.Cr.App.1987); Malone v. State, 452 So.2d 1386, 1389 (Ala.Cr.App. 1984). The appellant does not dispute the fact that he was informed of his Miranda rights. Moreover, Investigator Surrett testified *296 that the appellant's Miranda rights were explained to him.
The appellant, however, contends that the police failed to comply with the mandates of Miranda and the later case of Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), in that they continued to question him after he had invoked his Miranda right to remain silent. Our review of the record convinces us otherwise. We find no indication that the appellant was anything but willing to give the police a full confession.
The appellant next questions the voluntariness of the statement he gave while in police custody.
"`A confession is presumed to be involuntary. Before its admission into evidence there must be evidence addressed to the trial judge sufficient to rebut that presumption and a showing that the confession was made without influence of either hope or of fear, unless the attending circumstances affirmatively disclose the voluntariness of the confession.' Wallace v. State, 290 Ala. 201, 275 So.2d 634 (1973); Bush v. State, 282 Ala. 134, 209 So.2d 416 (1968)."
Mitchell v. State, 508 So.2d 1196, 1198 (Ala.Cr.App.1986).
The appellant contends that his statement was given while he was under the influence of alcohol and/or drugs. Here again, the record is devoid on any indication that the appellant was under the influence of alcohol and/or drugs. Moreover, at trial, Investigator Surrett testified that Mr. Henderson did not appear to be intoxicated or under the influence of drugs at the time that he gave his statement.
The voluntariness of an alleged confession is a question for the trial court, and a trial judge's decision as to the voluntariness of a statement will not be disturbed on appeal unless the decision is contrary to the great weight of the evidence and is manifestly wrong. Whitlow v. State, supra, 509 So.2d at 255; Tice v. State, 386 So.2d 1180, 1185 (Ala.Cr.App.), cert. denied, 386 So.2d 1187 (Ala.1980); Hurst v. State, 356 So.2d 1224, 1234 (Ala.Cr.App. 1978). Therefore, since the statements were given voluntarily and a Miranda predicate was shown, the statements were correctly received into evidence.

XII
The appellant next challenges the validity of the sentencing phase of his trial. The appellant argues that the jury was incorrectly instructed on several aggravating circumstances. Specifically, he argues that the jury instructions concerning the aggravating circumstances of murder for pecuniary gain and murder during the course of a robbery, "shifted the burden of proof to him and made his death sentence mandatory." Section 13A-5-49, Code of Alabama 1975, lists aggravating circumstances, the following of which are pertinent to the instant case,
"(4) The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping;
"....
"(6) The capital offense was committed for pecuniary gain;
"....
"(8) The capital offense was especially heinous, atrocious or cruel compared to other capital offenses."
Section 13A-5-50 states that "[t]he fact that a particular capital offense as defined in ง 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in ง 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstances or circumstances in determining sentence."
The appellant was indicted under two counts. The first count charged the appellant with murder for hire. The second count charged that the murder occurred during the theft of $80. The two counts are also considered aggravating circumstances as provided by ง 13A-5-49.
The appellant complains that the trial court's charge took away the function of the jury in regards to finding aggravating *297 circumstances. The charge reads as follows:
"Any aggravating circumstance which the verdict convicting the defendant established was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for the purposes of the sentence hearing. In respect to this, the State has proven beyond a reasonable doubt the aggravating circumstances of murder for hire for pecuniary gain and also robbery. That was done by your verdict in this case at the conclusion of the guilt stage today.
"The aggravating circumstances that are set out in Section 13A-5-49 of the Code of Alabama, and there are eight of them; however, you will only be concerned with three. Those are No. 4, No. 6, and No. 8. No. 4 is concerned with a capital offense while the defendant was engaged in a robbery. No 6 is concerned with a capital offense that was committed for pecuniary gain. These two aggravating circumstances are as a matter of law to prove, as I just mentioned to you."
The Supreme Court of the United States recently addressed this issue in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The petitioner in Lowenfield argued that because the aggravating circumstances were identical to elements of the crime charged, the jury was left at the sentencing phase, "merely to repeat one of its finding in the guilt phase, and thus not to narrow further in the sentencing phase the class of death-eligible murders." The Supreme Court stated, "the use of `aggravating circumstances,' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion. We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase." Lowenfield, 108 S.Ct. at 554.
As the State argues in its brief, Florida has addressed this issue in Henry v. Wainwright, 721 F.2d 990 (5th Cir.1983), cert. denied, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984). In Wainwright, the appellant argued that the use of the elements of the underlying felony during his sentencing phase shifted the burden of proof to him, since the elements had been proven at the guilt phase. The Fifth Circuit held that the burden of proof is not shifted since "the state must nevertheless prove the existence of aggravating circumstances." Wainwright, 721 F.2d at 996.
In a similar argument, the appellant, citing Ashlock v. State, 367 So.2d 560 (Ala.Cr. App.1978), cert. denied, 367 So.2d 562 (Ala. 1979), contends that an element of a capital offense cannot also be an aggravating circumstance. As this court stated in Floyd v. State, 486 So.2d 1309 (Ala.Cr.App.1984), aff'd, 486 So.2d 1321 (Ala.1986), cert. denied, 479 U.S. 1101, 107 S.Ct. 1328, 94 L.Ed.2d 179 (1987), this is specifically provided for by statute. See ง 13A-5-50, Code of Alabama 1975.
Moreover, as stated in Ex parte Kyzer, 399 So.2d 330 (Ala.1981), after the Model Penal Code was enacted, the Alabama legislature was faced with redefining its laws and punishments on murder. "... Alabama, as a policy choice, did not follow the model format, but elected to have the aggravating circumstances made a part of the offense, rather than a matter to be presented at a sentencing hearing." Kyzer, 399 So.2d at 337.
The appellant also argues that the trial court erred in charging the jury with the "aggravating factor that the killing occurred while Jerry Paul Henderson was engaged in a robbery." Appellate counsel argues in brief that "[i]t is clear from the facts of this case that the only act which could possibly be construed as a `robbery' was Jerry Paul Henderson's taking Jerry Haney's wallet." The appellant further suggests that the wallet was taken as a "mere afterthought" and in Alabama does not constitute a capital offense.
A murder is made a capital offense if committed during the course of a robbery. See ง 13A-5-40(a)(2), Code of Alabama 1975. The murder and robbery must be a "continuous chain of events." Hallford v. State, 548 So.2d 526, 535 (Ala.Cr.App.1988), *298 aff'd, 548 So.2d 547 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989), quoting Thomas v. State, 460 So.2d 207, 212 (Ala.Cr.App.1983), aff'd, 460 So.2d 216 (Ala.1984). "... the taking of the property of the victim need not occur prior to the killing." Hallford, 548 So.2d at 535.
In Hallford, the defendant took the victim's wallet after shooting him to death. After reviewing the jury instructions and the evidence, Judge Patterson concluded that indeed there was sufficient evidence to find the defendant guilty of capital murder "since the intervening time between the murder and the taking of the wallet formed a continuous chain of events." Hallford, 548 So.2d at 536.
In the instant case, the trial court gave the following instruction to the jury at the guilt phase of the trial,
"Now as to Count II of the indictment, which is a murder during robbery charged in that particular indictment. If you are convinced beyond a reasonable doubt that the defendant committed the crime of murder of the intentional killing type during a robbery in the first degree as alleged in the indictment, it would be your duty to find the defendant guilty of a capital offense. The two components of the capital offense are robbery in the first degree and murder of the intentional killing type committed during the robbery in the first degree.
"A defendant commits the crime of robbery in the first degree if he uses or threatens the use of force against the owner of personal property or any person present while in the course of committing a theft of personal property with the intent to overcome his physical power of resistance in order to compel his acquiescence in the taking of personal property and in the course of said theft either, (1) Intentionally causes serious physical injury or death to a person or, (2) is armed with a deadly weapon or dangerous instrument. Now in the course of committing a theft means acts which occur in the attempt to commit or in the commission of theft or in the immediate flight after the attempt or commission. A person commits the crime of theft of property if he knowingly obtains or exerts unauthorized control over the property of another with intent to deprive the owner of his property. An attempt occurs when a person, with intent to commit a specific offense does any overt act towards the commission of the offense.
"Now I will define for you what a deadly weapon is, and that is a firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious physical injury, and such term includes, but is not limited to, a pistol, rifle, or shotgun; or a switchblade knife, gravity knife, stiletto, sword or dagger, or any billy, black-jack, bludgeon or metal knuckles.
"A dangerous instrument is defined as any instrument, article, or substance which under the circumstances in which it is used, attempted to be used or threatened to be used, is highly capable of causing death or serious physical injury.
"Serious physical injury is defined as physical injury which creates substantial risk of death or which causes serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any body organ.
"In this case, if you are convinced beyond a reasonable doubt that the defendant committed the crime of robbery in the first degree as previously defined of Jerry Wayne Haney, in the first component of the capital offense as charged in the indictment, then Count II would have been proven.
"A defendant commits the crime of murder of the intentional killing type if with intent to cause the death of another person, he causes the death of that person or another person. A person acts intentionally with respect to a result or to conduct when his purpose is to cause that result or to engage in that conduct. The defendant must intentionally, as opposed to negligently, accidently or recklessly cause the death of the deceased in order to invoke the capital statute. The fact that someone dies or is killed during the course of a robbery does not automatically *299 provide that intent. The intent to kill must be real and specific in order to invoke the capital statute.
"To be a capital offense the murder of the intentional killing type must have been committed during the robbery in the first degree. During means in the course of or in connection with or in the immediate flight from the commission of the robbery in the first degree.
"In this case if you are convinced beyond a reasonable doubt that the defendant committed the crime of robbery in the first degree as previously defined, and during the course of said robbery committed the murder of the intentional killing type of Jerry Wayne Haney by the means alleged in the indictment, then the second component of the capital offense as charged in the indictment would have been proven.
"Therefore if you are convinced by the evidence beyond a reasonable doubt that the defendant committed the crime of murder of the intentional killing type of Jerry Wayne Haney by the means alleged in the indictment during a robbery in the first degree, then it would be your duty to find the defendant guilty of the capital offense charged in the indictment."
As Judge Patterson states in Hallford, the next question is whether there was sufficient evidence for the jury to find the appellant guilty of murder during the course of a robbery.
The evidence showed the appellant came to Alabama to kill his brother-in-law for the sum of $3000. He shot the victim three times. One shot entered his left lower arm and remained in his left chest. One bullet grazed his left ear. The fatal bullet entered the victim's mouth. The defendant's wife testified that the appellant told her that he shot the victim after pleas from the victim not to shoot him. The appellant then took the victim's wallet. There was sufficient evidence for the jury to find the appellant guilty of the capital murder of Jerry Haney. (For a thorough discussion of cases dealing with sufficiency of evidence in a murder committed during the course of a robbery, see 67 A.L.R. 4th 887.)
Appellant also states that there was no evidence that prior to the killing he had the intent to rob. The jury was thoroughly instructed on the issues of intent, and intent is a question for the jury.

XIII
The appellant next argues that the jury charge at the penalty phase violated his Eighth and Fourteenth Amendment rights. Specifically, he argues that the trial court erred in instructing the jury on the aggravating circumstances of heinous, atrocious, and cruel since the trial judge did not find the crime heinous, atrocious, or cruel in his written findings.
The appellant cites the case of Ex parte Williams, 556 So.2d 744 (Ala.1987), for the proposition that his sentence of death must be set aside. In Williams, an instruction on the aggravating circumstances of murder while under sentence of imprisonment, ง 13A-5-49(1), Code of Alabama 1975, was given to the jury. At the sentencing hearing, evidence established that Williams was on neither probation nor parole at the time of the murder. Our Supreme Court held that the instruction was not harmless in that case.
Williams is clearly distinguishable from the instant case. In Williams, the defendant was not on probation or parole at the time of the murder thus there was no ง 13A-5-49(1) aggravating circumstance present. In the present case, there was evidence that the murder was heinous, atrocious, or cruel.
The State urges us to analyze this issue according to jury instructions involving lesser included offenses. If there is a reasonable basis from which to conclude on the facts of the case that the charge falls within the lesser included offense, the instruction should be given. See Ex parte Hannah, 527 So.2d 675 (Ala.1988).
As the State argues, the facts in the instant case could have supported a finding of heinous, atrocious, or cruel. See Hallford, supra. In Hallford, the victim was *300 shot once, rendering him helpless, dragged to the river while pleading for his life and then shot in the head twice. These facts were found to constitute heinous conduct.
In the instant case, evidence established that the victim was shot once when he exited his home. When he tried to run away, he was shot again and collapsed. The victim pleaded with the appellant, his brother-in-law, to get help and not to shoot him again. The appellant, disregarding his pleas, put the shotgun to the victim's head and shot him a third time. This bullet fractured almost every bone in the victim's skull and one tooth was driven into the victim's spinal cord. Surely, like the murder in Hallford, this murder also could be found to be heinous, atrocious, or cruel. (For a thorough discussion of what constitutes heinous, atrocious, or cruel, see 63 A.L.R.4th 478.) "This act was conscienceless and pitiless and torturous." Hubbard v. State, 500 So.2d 1204, 1227, aff'd, 500 So.2d 1231 (Ala.1986), cert. denied, 480 U.S. 940, 107 S.Ct. 1591, 94 L.Ed.2d 780 (1987). As Judge Tyson stated in Whisenhant v. State, 482 So.2d 1225, 1236 (Ala.Cr. App.1982), remanded on other grounds, 482 So.2d 1241 (Ala.1983): "The jury is not free ... to arbitrarily ignore any factor, positive or negative, in arriving at the correct sentence."
The Court of Appeals for the Tenth Judicial Circuit has recently addressed the issue of whether the harmless-error analysis can be applied to the submission of an invalid aggravating circumstance dealing with heinous, atrocious, or cruel. See Coleman v. Saffle, 869 F.2d 1377 (10th Cir. 1986):
"In applying harmless-error analysis, we must ask ourselves whether we can `declare a belief that [the constitutional error] was harmless beyond a reasonable doubt.' Chapman [v. State of California], 386 U.S. [18], 24, 87 S.Ct. [824], 828 [17 L.Ed.2d 705] [(1967)]. In doing so, we look at the entire trial record. [Delaware v.] Van Arsdall, 475 U.S. [673], 684, 106 S.Ct. [1431], 1438 [89 L.Ed.2d 674] [ (1986) ]. We recognize that there is a heightened need for reliability in making the harmless error determination in a capital case, see Johnson [v. Mississippi, 486 U.S. 578], 108 S.Ct. [1981], 1986, 1988-89 [100 L.Ed.2d 575] [ (1988) ]; Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973 (1978) (plurality opinion), but conclude that in the instant case, the unconstitutional submission to the jury of the `heinous, atrocious, or cruel' aggravating circumstances was harmless beyond a reasonable doubt."
Coleman, 869 F.2d at 1389.
As discussed earlier, there was "`overwhelming evidence of both guilt and aggravating factors.'" Coleman, 869 F.2d at 1390. There is no reason why the appellant's death sentence should be vacated, because the trial court instructed the jury on the heinous, atrocious, or cruel aggravating circumstance.

XIV
The appellant further argues that the trial court erred in not allowing evidence of events and statements made after the date of the crime. Specifically, he states that he was prevented from establishing his reasons for traveling to the victim's residence.
The appellant testified at the sentencing phase as to why he went from Georgia to Alabama to see his brother-in-law. The appellant argues that the trial court violated Lockett v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). As the Supreme Court states, the sentencer should "... not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Lockett, 438 U.S. at 604, 98 S.Ct. at 2964-2965. Appellate counsel in his reply brief states that the appellant is "[e]ntitled to present all the evidence he could muster that mitigating circumstances existed." However, as Lockett states, "[n]othing in this opinion limits the traditional authority of a court to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." Lockett, 98 S.Ct. at 2965, n. 12.
The appellant cites the following from the record:

*301 "MR. PITTS: And then we would hope, Your Honor, to call Tanya [Haney, daughter of the victim and Judy Haney] and we will ask her many thingsโa few things, and among those we will ask her the reason that she, her mother, and her brother went to Georgia.
"MR. RUMSEY: Now wait a minute. Now if Tanya testifies the reason her mother did somethingโit's just notโI know, and I'm not trying to do anything to cause reversal or any capital case on the penalty phase, but there are still some rules of evidence. Even in a penalty phase, and one isโto get up there and put a child on who was thirteen years old the time this thing happened and tell what her mother did, or why she did it.
"MR. PITTS: Well Tanya can tell why she was over there and that sort of thing.
"THE COURT: Well, let's go forward and we will see where we are.
"MR. RUMSEY: The position that we are going to get to is obviously this, that Tanya hits the witness stand after the defendant and she starts testifying on this, this, and this. Okay? And then there isโwe have to send the jury out because anything that is said after January 1, 1984, is totally immaterial.
"THE COURT: I think you are right in that regard. I don't think it would be relevant after that time. Before then I think it probably would."
The appellant states that he was prevented from introducing evidence of statements made after the date of the crime. Obviously, the trial court felt that evidence of events occurring before the date of the murder was relevant to the appellant's motive, but that evidence of events subsequent to the murder were not. Based on the aforementioned authorities, the trial court was correct.

XV
The appellant further argues that in several instances during the trial, the prosecutor committed reversible error by telling the jury not to consider sympathy in reaching its decision.
The following occurred during the voir dire:
"I think the Judge will tell you that as a juror you should decide what the true facts in this case are, that you will take the evidence that comes to you from the witness stand, being testimony and exhibits and that you would take those and apply the law to them that the Judge gives you and that you should not consider any sympathy or speculation or conjecture but that which comes to you from the witness stand under oath.
"I think the Judge will charge you that a case should be decided on the evidence and that being the testimony and the exhibits that come from the witness stand and then the Judge's charges as to the law. It should not be decided upon any type of sympathy or upon any speculative or speculation or conjecture. Is there any one of you, if you are selected as a juror, that could not render a fair and impartial verdict based strictly upon the evidence that comes to you from the witness stand?"
And the following occurred during the closing argument in the guilt phase:
"I stand here a bunch of times, day after day, week after week, month after month, and year after year. And I stand in the same position and this is what I do. I try cases like this. You ladies and gentlemen are from all over this county, not because you wanted to come, but because of an obligation. You came and you fulfilled that obligation. We didn't tell you that when you came in here on Monday that it was going to be easy, because I knew what was in store. I know it is a hard decision. It ought to be something you think about. But I submit this to you ladies and gentlemen, that when you walk into this room, you shed sympathy. You shed fear and you shed those things as a normal human being that you are entitled to have. When you go home several hours from now you have a right to put those things back on and be afraid, to have fear."
The United States Supreme Court in California v. Brown, 479 U.S. 538, 107 S.Ct. *302 837, 93 L.Ed.2d 934 (1987), faced the question of "whether an instruction informing jurors that they `must not be swayed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling' during the penalty phase of a capital murder trial violates the Eighth and Fourteenth Amendments to the United States Constitution." Brown, 479 U.S. at 539, 107 S.Ct. at 838.
The Court said that this charge was "meant to confine the jury's deliberations to considerations arising from the evidence presented.... It serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors." Brown, 479 U.S. at 543, 107 S.Ct. at 840.
The reference to sympathy for the victim's family are those which are specifically prohibited. See Rutledge v. State, 523 So.2d 1087 (Ala.Cr.App.1987), reversed on other grounds, 523 So.2d 1118 (Ala.1988); Lowman v. State, 38 Ala.App. 612, 91 So.2d 697, cert. denied, 265 Ala. 698, 91 So.2d 700 (1956).
The North Carolina Supreme Court recently dealt with a similar issue. The following was included in the prosecutor's closing argument in the sentencing phase:
"Jesus says in the Lord's prayer, `Forgive us our trespasses as we forgive those who trespass against us,' but you have no right under the law. And you may forgive trespasses in your personal life, you may forgive those trespasses, but you have no right as a sworn juror in the State of North Carolina to forgive the trespasses against the State of North Carolina. That is to have no part in your deliberations. You cannot forgive the defendant for what he did to Brenda Smith. And your verdict, be it life or be it death, should be no reflection on any sympathy or forgiveness or any religious feelings you have about this case."
State v. Price, 326 N.C. 56, 388 S.E.2d 84, 101 (1990).
As the court stated, "the prosecutor was plainly and properly admonishing the jurors that feelings of sympathy and forgiveness rooted in their hearts and not also in the evidence may not be permitted to affect their verdicts." Price, 388 S.E.2d at 102. The same can be said of the prosecutor's comments in the instant case. The remarks made by the prosecutor are acceptable as provided in Brown, supra.

XVI
The appellant next raises several issues concerning the presentence report, which indicated that the appellant had four prior convictions, three felonies, and one misdemeanor. Initially he argues that he was not given sufficient notice of its contents prior to his sentencing hearing. The record reflects that the appellant was furnished a copy of the report prior to sentencing. However, there is no indication in the record of when he received the report. In brief, appellate counsel states that the appellant "... received the presentence report at most twenty-four hours before the sentencing hearing."
In Thompson v. State, 503 So.2d 871, 881 (Ala.Cr.App.1986), aff'd, 503 So.2d 887 (Ala.1987), cert. denied, 484 U.S. 872, 108 S.Ct. 204, 98 L.Ed.2d 155 (1987), we stated that an appellant was not prejudiced when he received a copy of the presentence report one day prior to sentencing. As in Thompson, the appellant in the instant case did not deny any portion of the report during sentencing or later in any motions.
The appellant further argues that the record contains no evidence that the appellant was represented by counsel in his prior convictions. During the sentencing hearing, the appellant took the stand and admitted that he had been represented by counsel in his three prior felony convictions. However, no mention was made of whether he had been represented by counsel in his misdemeanor conviction.
The appellant's prior felony convictions negated the application of the statutory mitigating circumstances of no prior criminal record in ง 13A-5-51(1), Code of Alabama 1975.
Further, as the United States Supreme Court held in Barclay v. Florida, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983), *303 even had the trial court considered the appellant's prior misdemeanor as a aggravating circumstance, no new sentencing hearing would be required. In the instant case, the trial court found that no mitigating circumstances existed. As the Supreme Court stated, if no mitigating circumstances were found, "a harmless-error analysis" would apply. 463 U.S. at 955, 103 S.Ct. at 3427-28. "As long as the trial judge properly exercises his discretion and the facts indicating the death penalty are `so clear and convincing that virtually no reasonable person would differ,' a harmless error analysis can be used." Baldwin v. State, 456 So.2d 117, 126 (Ala.Cr.App.1983), aff'd, 456 So.2d 129 (Ala.1984), aff'd, 472 U.S. 372, 105 S.Ct. 2727, 86 L.Ed.2d 300 (1985). This Court has applied this harmless error analysis where one mitigating circumstance was found to exist. See Baldwin, supra. Here, no mitigating circumstances were present, and the evidence clearly established the appellant's guilt. Even had the trial court considered the prior misdemeanor conviction, that consideration would have been harmless.
Last, concerning the guilt phase, the appellant argues that the presentence report contained highly prejudicial matters and denied him of his Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Specifically, the appellant argues, the report contained a list of aggravating circumstances and also a recommendation as to punishment.
Section 13A-5-47, Code of Alabama 1975, provides that a presentence report will be prepared prior to sentencing. The presentence report informs the court of "the guideline categories that the officer believes apply to the particular case, the kinds of sentences and the sentencing range believed to apply, any mitigating or aggravating circumstances." Project: Nineteenth Annual Review of Criminal Procedure, 78 Geo.L.J. 1240 (1990).
The presentence report was prepared for the judge's benefit; it was not shown to the jury. The trial judge evaluated the material in the report, considered the jury's recommendation, and sentenced the appellant to death. His findings are clearly substantiated by the record.

XVII
The appellant's final contention is that the prosecutor was guilty of several instances of prosecutorial misconduct, the cumulative effect of which mandates reversal in this case. The complained-of incidents of misconduct were the prosecutor's 1) introduction of Billy Haney to the jury, 2) statement that he represented the victim's family, 3) statement that the jury should leave sympathy at the door when deliberating on its penalty phase verdict, 4) statement that each juror had pledged to vote for death, and 5) suggestion that because there are only 14 defined capital crimes in Alabama the jury should more readily sentence a defendant who has committed more than one of these crimes in the same incident to death.
The appellant's first and second contentions of prosecutorial misconduct have already been addressed by this Court in Part V of this opinion and determined adversely to him. The appellant's fourth contention of prosecutorial misconduct is simply not supported by the record.[4] In fact, the prosecutor's remark was not that the jurors had pledged to vote for death, but that,
"[W]hen we came into this courtroom on Monday morning, we made certain pledges to each other, that you would try the issues joined between the State of Alabama and the defendant and render a fair and impartial verdict based upon the evidence that comes to you from the witness stand, and I never doubted for a moment that you would do that. That you were not opposed to capital punishment, and I never doubted for a moment that you would consider it, and that's what we ask you to consider. To do what you think is right and what you think is just in this case."
*304 This leaves only appellant's third and fifth contentions of misconduct to be addressed. We would note that neither of these alleged instances of misconduct was objected to at trial. Thus, any reversal would have to be predicated upon plain error. "Plain error only arises if the error is so obvious that the failure to notice it would seriously affect the fairness or integrity of the judicial proceedings." Womack, supra, 435 So.2d at 769.
No such error occurred here. As we have previously stated, the task of this Court in reviewing alleged acts of prosecutorial misconduct is to consider the impact of those acts in the context of the particular trial, and not view the allegedly improper acts in the abstract. Whitlow v. State, supra, 509 So.2d at 256; Wysinger v. State, supra, 448 So.2d at 97. In judging a prosecutor's closing argument, the question is whether the argument "`so inflicted the trial court with unfairness as to make the resulting conviction a denial of due process.'" Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986), quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). There, the United States Supreme Court found no due process violation, despite the prosecutor's repeated expression of his personal desire that the defendant had been killed during the crime. 477 U.S. at 180 n. 12, 106 S.Ct. at 2471 n. 12. Likewise, for the reasons set out above, we find that the prosecutor's penalty phase closing argument did not deny appellant a fair trial.

XVIII
As required by Beck v. State, 396 So.2d 645 (Ala.1980), and ง 13A-5-53, Code of Alabama 1975, we have reviewed this case for any error involving the appellant's conviction and the propriety of his death sentence.
The appellant, Jerry Paul Henderson, was indicted and convicted for violating งง 13A-5-40(a)(2) and 13A-5-40(a)(7), offenses punishable by death.
There is no suggestion in the record that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Indeed, the trial court very specifically instructed the jury to avoid such influences. We likewise find no evidence to support any such contention.
Our review of the sentence proceedings reveals that the trial court's findings concerning the aggravating and mitigating circumstances are supported by the evidence. The trial court found the existence of two aggravating circumstances: first, that the capital offense was committed while the appellant was engaged in the commission of a robbery, ง 13A-5-49(4), Code of Alabama 1975; and second, that the capital offense was committed for pecuniary gain, ง 13A-5-49(6), Code of Alabama 1975. After considering each of the statutory mitigating circumstances set out in ง 13A-5-51, Code of Alabama 1975, and the possibility of any non-statutory mitigating circumstances as allowed by ง 13A-5-52, Code of Alabama 1975, the trial court found the existence of no mitigating circumstances. This finding was also supported by the evidence.
Our independent weighing of the aggravating and mitigating circumstances convinces this Court of the propriety of the death sentence in this case.
Moreover, we are convinced that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Indeed, fully two-thirds of Alabama's death sentences have been imposed on defendants convicted of capital murder arising out of robbery-homicides. Beck v. State, supra, 396 So.2d at 654 n. 5. See, e.g., Hinton v. State, 548 So.2d 547 (Ala.Cr.App.1988), aff'd, 548 So.2d 562 (Ala.), cert. denied, ___ U.S. ___, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989); Bell v. State, 475 So.2d 601 (Ala.Cr.App. 1984), aff'd, 475 So.2d 609 (Ala.), cert. denied, 474 U.S. 1038, 106 S.Ct. 607, 88 L.Ed.2d 585 (1985). See also Williams v. State, 461 So.2d 834 (Ala.Cr.App.1983), rev'd on other grounds, 461 So.2d 852 (Ala.1984) (murder for hire).
*305 Finally, we have searched the entire record for any plain error or defect which might have adversely affected the appellant's substantial rights and have found none. Rule 45A, Ala.R.App.P.
The appellant received a fair and impartial trial. Therefore, his conviction for this capital offense and his sentence of death are due to be, and they are hereby, affirmed.
AFFIRMED.
All the Judges concur, except BOWEN, J., concurs in result only.

ON APPLICATION FOR REHEARING
BOWEN, Judge, concurring in part, dissenting in part.
The majority overrules the applications for rehearing filed by both the State and the appellant. I agree that the appellant's application should be overruled without opinion.
However, I would grant the State's application for rehearing and modify the opinion of the court to show the following:
First, in upholding the application of the aggravating circumstance provided in Ala. Code 1975, ง 13A-5-49(8), this Court did, in my opinion, apply the standard set forth in Ex parte Kyzer, 399 So.2d 330 (Ala.1981).
Second, in holding that the prosecutor's comments that the jury should not consider sympathy, this Court did, in my opinion, follow the holding of Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). See Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App.1990).
Therefore, I concur in the majority's order overruling the appellant's application for rehearing and dissent from the majority's order overruling the State's application for rehearing.
NOTES
[1] Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).
[2] We note that the facts in this case are distinguishable from those in Bailey v. State, [Ms. 4 Div. 423, May 25, 1990] (Ala.Cr.App.1990), in that the cause of death was not deleted from the autopsy report before another expert was asked to give his opinion as to cause of death based on the report.
[3] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[4] Neither is the case cited as authority for this prosecution. Woodson v. North Carolina, 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976), holds simply that a mandatory death penalty statute is unconstitutional; it is not applicable to the issue raised here.